Randy Lynn **WOOLLS**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 68878.

Court of Criminal Appeals of Texas,
En Banc.

March 9, 1983.

Rehearing Denied Feb. 29, 1984.

**456**

Kirk Hawkins, San Angelo, Richard C. Mosty, Kerrville, for appellant.

Ronald L. Sutton, Dist. Atty., Junction, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

Appellant was convicted of capital murder. Upon the jury's findings that the killing was deliberate and that appellant represents a continuing threat to society, punishment was assessed at death.

Appellant now contends the court erred in overruling his motion to quash the indictment. Appellant points out that the indictment fails to allege the names of the victim of the underlying offense of robbery in the course of which the murder was alleged to have been committed, citing *Silguero v. State*, 608 S.W.2d 619 (Tex.Cr.App.1980); *Evans v. State*, 601 S.W.2d 943 (Tex.Cr. App.1980); *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980); and *King v. State*, 594 S.W.2d 425 (Tex.Cr.App.1980), in each of which the indictment failed to allege the name of the victim of the underlying offense and in each of which the overruling of a timely motion to quash made upon that basis was held to be reversible error.

The instant case can be distinguished from the cases cited. In the instant case, no motion to quash was made upon the basis that the indictment failed to allege the victim of the underlying offense.

Absent an attempt to draw the court's attention specifically to the failure to name the victim of the underlying transaction, nothing is presented for review. *Kipperman v. State*, 626 S.W.2d 507, 512 (Tex.Cr.App.1981).

Appellant next contends the court erred in permitting the prosecutor to state during the jury voir dire that:

"... Now evidence of temporary insanity caused by intoxication may be introduced by the defendant in mitigation. Mitigation means a lessening of the penalty attached to the offense for which he's been tried. Now it's not a defense. Intoxication is not a defense to an act but for punishment purposes, and you are talking about how the defendant should be punished. The defendant may introduce evidence of temporary insanity caused by voluntary intoxication for the jury's consideration and they may or may not consider it."

Similar statements were made by the prosecutor to several jurors who were later seated.

In its charge upon the punishment issues, the court instructed the jury in pertinent part as follows:

"5.

"You are instructed that under our law neither intoxication nor temporary insanity of mind caused by intoxication shall constitute any defense to the

commission of crime. Evidence of temporary insanity caused by intoxication may be considered in mitigation of the penalty attached to the offense.
"...

"Now, if you find from the evidence that the defendant, RANDY LYNN WOOLLS, at the time of the commission of the offense for which he is on trial was laboring under temporary insanity as above defined, produced by voluntary intoxication as above defined, that you may take such temporary insanity into consideration in mitigation of the penalty which you attach to the offense for which you have found him guilty."

Appellant, in objecting to the charge,[1] stated:

"MR. MOSTY: As to number five—paragraph number five the defendant objects to number five, the fourth paragraph therein, third line from the bottom. Object to the word 'may'. That you may take such temporary insanity into consideration in mitigation of penalty.' The word properly should be that you 'should' take such temporary insanity into consideration.

"MR. ABLES: The State would object.

"THE COURT: In conformity with the rulings that we made in voir dire examination I overrule the objection."

We note that no objection was taken to the abstract instruction, made three paragraphs before the application to the facts of the law of mitigation for intoxication-

caused temporary insanity which was objected to, that "[e]vidence of temporary insanity caused by intoxication *may* be considered in mitigation of the penalty attached to the offense." [Emphasis added]

■ Regardless of whether appellant's failure to object to the abstract instruction constituted a waiver of his prior objection, we do not perceive how appellant could have been harmed by the prosecutor's statement upon voir dire that the jury "may or may not consider" intoxication in mitigation when the court's charge later instructed them that they "may consider" it.

The ground of error is overruled.

Appellant next contends the court erred in excusing for cause, over objection and in violation of the holding of the United States Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), five veniremembers.

Veniremember Willie Kendall stated several times in response to questioning by the prosecutor that he would answer "no" to one of the punishment questions[2] regardless of whether the State had proved to his satisfaction beyond a reasonable doubt that appellant had killed deliberately and would constitute a continuing threat to society.

Upon questioning by defense counsel in an apparent attempt to rehabilitate Kendall, the following colloquy occurred:

"Q. Let me ask it to you now. If you were sitting as a juror and had found a person guilty of capital murder and then you were called upon to deliberate as to punishment, and at that stage

---

1. The overruling of appellant's objection to the charge has not been assigned as error on appeal.

2. Art. 37.071, V.A.C.C.P., provides for a punishment hearing upon a verdict of guilty of capital murder. Art. 37.071(b) and (c) provide:

"(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

"(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

"(c) The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of 'yes' or 'no' on each issue submitted."

you would have heard all of the facts and circumstances of the case.

"A. Yes, sir.

"Q. You heard every detail of how this offense that you had found a person guilty of, how the offense had been committed. What particular acts transpired. Now at that stage, would you vote automatically against the death penalty regardless of how gruesome or brutal or bizarre the facts of the capital murder were?

"A. Yes, I would.

"Q. You would automatically vote against death no matter how terrible the crime might have been?

"A. (No audible response.)

"Q. You have to answer yes or no.

"A. Yes.

"Q. So the Court Reporter can get it.

"A. Yes.

"Q. I know these aren't easy questions for anyone, but we need for you to answer yes or no so the Court Reporter can get it and not a nod of the head. Now I thought that your first answer was—And I know that now you've had a little more time to reflect after we've talked about it. I thought that when the Judge first asked you are you opposed to the death penalty for any crime, I thought that your first answer was, no, I guess not.

"A. I don't know. I said I was against capital punishment.

"MR. MOSTY: Okay. Well, then, I might have written it down wrong. I might have missed it. Are you unalterably opposed to capital punishment?

"MR. KENDALL: Yes, sir."

The State thereupon challenged Kendall for cause, and the challenge was sustained.

Veniremember Shelton stated in response to the court's voir dire that he could not consider death penalty, and that he did not think he could answer each punishment question "yes."

Upon examination by the prosecutor, Shelton stated that he could not vote to answer each punishment question "yes",

and that he was irrevocably committed to vote against the death penalty regardless of the facts adduced. The State then made its challenge for cause.

Defense counsel thereupon questioned Shelton in an attempt to rehabilitate him, and the following exchange occurred:

"... Can you conceive of a sitatuion so henious, (sic) so bad—such a violent crime that it's just so bad that after you've heard evidence of that, whether you were a juror or not, but after you've heard evidence of that crime that you feel like in your mind capital punishment would be a proper mode of punishment for a defendant and then considering the defendant's past record also.

"MR. SHELTON: I don't think so.

"MR. JOHNSON: Q. All right. And again I hate to be like Mr. Sutton and put you on the spot but, you know, we need to know.

"A. My opinion on the imposition of the death penalty is negative toward that issue. The answer is no.

"Q. All right. Not under any circumstances could you consider it if you were a juror?

"A. No.

"Q. Okay. Could you consider the two issues that we've been talking about. Just voting on them knowing the effects of your answers after you had heard the evidence and the evidence both of the commission of the crime, of what was done, and the past record of the defendant, if any, that was offered. Could you vote on the issue of whether or not the defendant deliberately killed a person and whether or not he would be a continuing threat to society knowing the effects of your answers?

"A. (No audible response).

"Q. What I meant to say a while ago, when I say I hate to be like Mr. Sutton, I hate to be like Mr. Sutton as to putting you on the hot seat or something, but we need a yes or no answer.

"A. No."

The State's challenge was then iterated and sustained.

Veniremember Thigpen, after declaring her opposition to the death penalty, responded to the court's inquiry about whether she would automatically vote against its imposition regardless of the facts of the case by saying, "yes, I would."

Upon examination of Thigpen by the prosecutor, the following exchange occurred:

"Q. I don't suppose there's any situation where you personally could be part of imposing the death penalty?

"A. Well, possibly if it was too close to me. I think so. I suppose it's a possibility.

"THE COURT: I don't understand the question.

"MR. ABLES: I asked her if there was any situation where she could impose the death penalty and I think she said if it was somebody close to her.

"MRS. THIGPEN: It's a possibility, but I doubt it.

"MR. ABLES: Q. You doubt that you could do it even if it was somebody close to you?

"A. I doubt it.

"Q. Let me tell you what happens here. In Texas you don't go out and deliberate on this for a while and then come back in and the jury says, we sentence the defendant to death in a capital murder case. It's a little bit different than that. After hearing the evidence the jury deliberates on decides, first, is the defendant guilty or not guilty. If they find that he's guilty, then they go out and deliberate on two questions that the Judge gives them. If they answer yes to both those questions, then the Judge assesses the death penalty. The first question is, first of all, you decide whether or not the defendant deliberately committed the acts, knowing that the death of the decedent would result. And, two, would he be a continuing threat to society. That's kind of a shorthand rendition, but if you find yes to both of those then the Judge has no other alternative but to impose the death penalty. Now could you set on the jury and answer the evidence—answer those questions just based on the evidence knowing that if you answered yes that the Court's going to have to render the death penalty in the case?

"A. No, I couldn't.

"Q. You could not?

"A. No.

"Q. You would automatically vote against anything that imposed the death penalty?

"A. I'm afraid so.

"Q. I take it, then, that you are irrevocably committed to vote against the death penalty no matter what the situation is?

"A. Right."

Defense counsel then attempted to rehabilitate Thigpen:

"... I think maybe you said where it was very close to me, or something to that effect, that you could possibly inflict the death penalty to a defendant who you were convinced was guilty of the offense, is that correct?

"A. I said possibly, but I don't think so.

"Q. You know, in a situation where it was very close to you. A family member, or something like that, you would not rule out the death penalty automatically in a situation like that, would you?

"A. I don't know, I really don't know.

"Q. I'm not asking you to say whether or not you would give the death penalty or whether or not you would not give the death penalty but just that, you know, could you consider any kind of situation in which you might possibly consider giving, and you said that yes, you could. Is that right?

"A. I suppose so.

"MR. MOSTY: All right. Your Honor, we submit she's qualified.

"MR. ABLES: Your Honor, would you like for me to inquire further?

"THE COURT: I don't know whether this is an appropriate time or not, but I'm going to deny the challenge for cause at this time. You may proceed."

Whereupon the State conducted further voir dire, including the following:

"A. I could not do it.

"Q. You could not give the death penalty under any circumstances?

"A. No.

"Q. Now under—

"A. I couldn't live with it.

"Q. I understand. Somebody in our family close to us gets killed and maybe in a situation like that we would think we would go a little further than we could in other situations, but you think you could't (sic) even handle assessing a death penalty if somebody was killed that was close to you?

"A. I don't think so. It would be too much for me to live with."

After a further challenge for cause by the prosecutor, the court interposed a question:

"THE COURT: I'm not sure I understand your response here because it seems to be a little different to each attorney. Could you imagine a fact situation—I'm not talking about this case.

"MRS. THIGPEN: No.

"THE COURT: That is so bizarre or so henious (sic) as to any defendant to where you could consider giving the death penalty?

"MRS. THIGPEN: No, sir. I never could give the death penalty.

"THE COURT: Under any circumstances?

"MRS. THIGPEN: No."

In a last attempt to rehabilitate the venire-remember defense counsel returned to the theme of a hypothetical relative-victim:

"MR. MOSTY: All right. Or a life or death in a capital murder case. Those are the two penalties, and I'm not trying to get you to commit to one or the other, but it's just could you consider both under the most brutal, bizarre, henious (sic) facts that you could ever consider, and considering prior—And a minute ago you said on a family member you could possibly consider it. I'm not saying on a family member I would give death and on a family member I would give life, but could you consider the two.

"MRS. THIGPEN: I don't believe I could. It's a possibility. Anything is possible. I don't believe I could, no.

"MR. MOSTY: Q. All right. I know this business about anything is possible—until you hear the facts you don't know what's going to be possible, so could you keep an open mind until you hear the facts of any case?

"A. I doubt it. It's possible.

"Q. Now again you said, 'it's possible'.

"A. It would depend on how sure I was, you know. I don't believe I could return a verdict that meant death to anyone under any circumstances.

"Q. But again you said that, and a while ago you said possibly I could.

"A. I said, 'all things are possible'. But I just don't think so, no.

"Q. All right. Looking from today forward, you can—You don't think so, but after hearing all the evidence, then it might be a possibility, is that what you are saying?

"A. I don't know how I would feel about it. You know, if it were in fact one of my family I wouldn't be on the jury, anyway.

"Q. Well, of course.

"A. So there you go. That's the only possible way that I could and I don't even think I could then. Like I say it could be possible, but even then I don't think I could.

"Q. But that's a possibility.

"A. It's possible.

"MR. MOSTY: Your Honor, we submit she's qualified.

"MR. ABLES: Your Honor, based on her last answer that she knows she couldn't even be on that jury, I think the challenge should be granted.

"THE COURT: I'm going to pose the same question to the juror again. Conjuring up in your mind the most severe offense that you can think of against any person that you may think of as can you think of any circumstances in which you could consider giving the death penalty or voting for an issue which would give the death penalty?

"MRS. THIGPEN: No, sir.

"THE COURT: I'm going to sustain the challenge for cause...."

In response to voir dire by the State, veniremember McCullough stated that he thought he would have to answer "no" to the second punishment question, regardless of the facts, because he didn't think he could be convinced beyond a reasonable doubt that a person would be a continuing threat to society.

McCullough further stated that he was irrevocably committed to vote against the imposition of the death penalty, regardless of facts in evidence.

The court then read to McCullough "[t]he probable instruction [he] would be given in a capital case... [concerning] punishment," both pointing out the effects of "yes" or "no" answers to the punishment issues and instructing the jury not to consider those effects, and asked McCullough whether he would "automatically vote a no answer to at least one of the questions regardless of the facts after having heard all the evidence at the trial and at the punishment stage?"

McCullough answered, "Yes. I would vote at least one no answer."

The court inquired, "Automatically?"

McCullough responded, "Automatically."

McCullough had earlier stated upon voir dire by defense counsel, who had asked him whether he could consider the death penalty, "Yeah. You can consider whether you can impose it or not." Defense counsel now returned to this line of questioning and the following colloquy occurred:

"Q. Mr. McCullough, I take it that your answer is still the same. Would you automatically refuse to consider the death penalty. Your answer is still, no, you would not refuse to consider it under any circumstances. Considering the crime itself and the evidence of a prior record by the defendant. You would consider it.

"A. Again, yes, I would consider it.

"MR. MOSTY: All right. That's all. Thank you.

"THE COURT: I want to interject here, if it changed any, would you consider it with a view towards given the death penalty?

"MR. McCULLOUGH: No.

"THE COURT: I'm going to sustain the State's challenge for cause...."

Veniremember Huerta, upon voir dire by the prosecutor, stated that she could not conceive of a situation so bad that she could vote, in effect, for the death penalty. Asked whether she was irrevocably committed to vote against the death penalty, her answer was affirmative, even when asked whether she would cast such a vote without regard to the evidence.

Defense counsel sought to rehabilitate Huerta:

"MR. MOSTY: Q. Could you, if you were called on to answer either of those two questions yes or no, was the conduct deliberate and would the person be a continuing threat to society. Could you sit with an open mind and go in and answer those two questions based on all the evidence that was presented to you?

"A. I don't think I could because whatever decision I make means that the Court is going to decide capital punishment.

"...

"Q. ... Now the question is, and you will be instructed as a juror to disregard the effect of your answers. To judge your answers based solely on the evidence and just let, you know, wherever the chips fall they will. Now do you feel like you could do that, disregard the effect of your answers

and make answers to those questions based on the evidence alone.

"A. Disregard the answers that I gave?

"Q. The effect of your answers. What the ultimate sentence would be. Disregard that and answer the questions based solely on the evidence presented to you.

"A. He would still get the death penalty.

"Q. Right. My question is, really, can you disregard the effect of your answers. Set aside your general opposition to the death penalty and answer the questions, and the Court will tell you that you must answer these questions based on the evidence, disregard *the effect of your answers.*

"A. I think I could.

"Q. Do you think you could sit and answer the questions based on the evidence alone?

"A. Maybe so. I don't know.

"Q. Maybe so. The Court will instruct you to do it, and do you feel like you can follow whatever instructions the Court gives you?

"A. But we still come to the thing about the death penalty.

"Q. It's always going to be back there and you are going to know about it, but you are going to be instructed to disregard it by the Judge.

"A.. I don't know. I wouldn't be able to answer your question. I don't know.

"Q. I don't know might be the best evidence.

"A. I really don't know. I can't make a decision right now.

"Q. Sitting today looking forward, you just can't be sure?

"A. Can't be sure."

The court then interposed an explanation of the questions to be asked at the punishment stage, if any, and, describing the jurors' duty to consider the answers to such questions based upon the facts adduced, asked Huerta, "Could you do that or would you *automatically vote no* so that the man could not get a death penalty regardless of

what the facts are. That's the question that they are asking."

The following colloquy resulted:

"MRS. HURETA (sic): Okay. I think I would automatically vote no.

"THE COURT: No matter what the facts are. You can conjure up a real serious crime in your mind. The worst thing that you can think of, and you would still automatically vote no to those questions just because it would mean the death penalty?

"MRS. HURETA (sic): Yes.

"MR. SUTTON: Q. Teresa, I didn't quite understand your last answer when you were talking to the Court. Did you say that you would automatically vote no regardless of the facts?

"A. Yes. Regardless of the facts presented because of the death penalty.

"Q. We wouldn't be asking you to set these aside but if you served you would have to, you understand.

"A. Yes.

"Q. Your feelings are such that you would automatically vote in such a manner that you would not impose the death penalty regardless of the facts?

"A. Yes.

"THE COURT: Mr. Mosty, you can continue to inquire.

"MR. MOSTY: I have no further questions...."

Kendall and Shelton were unvarying and unequivocal in their refusal to consider "yes" answers to the punishment questions. Thigpen was as unswerving as those two with the exception of the hypothetical—and irrelevant, as Thigpen herself noted—case of the murder of her close relative; even in that case Thigpen believed she would be unable to return an answer which would lead to the imposition of the death penalty. McCullough did state that he could consider "whether [he] can impose [the death penalty] or not" but made it clear by his answers that this consideration would not extend to whether to return answers which would impose it. Fi-

nally, Huerta, although confused and discomfitted by the voir dire process,[3] was forthright in her opposition to the death penalty and in her determination to vote "no" to the punishment issues.

■ Each of the veniremembers whose challenge for cause forms the basis of this ground of error made it unmistakably clear that he or she would *"automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them," and all were thus within that limited group of prospective jurors which *Witherspoon* permits to be excused[4] upon grounds related to their attitude toward the death penalty. *Adams v. Texas*, 448 U.S. 38, 44, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Witherspoon*, supra, at 522–523, n. 21.

The ground of error is overruled.

Appellant also contends the court erred in excusing for cause, over appellant's objection, veniremember Gutierrez.

In response to preliminary questions, Gutierrez responded that, while he did have conscientious scruples against the death penalty, he could not say whether he could vote the death penalty or, knowing the death penalty was a possible punishment, decide fact issues:

> "THE COURT: Would you automatically vote against imposing the death penalty in any case regardless of the facts of the case?
>
> "MR. GUTIERREZ: I don't know. I couldn't answer that. It would just— Well, still I would be faced with it. I can't answer that.
>
> "...

**3.** Several references to Huerta's apparent nervousness appear in the record.

**4.** Of course, *Witherspoon* and *Adams* do not authorize or require the excusal of any veniremember; they *limit* the excusal of jurors upon the basis of opposition to the death penalty so that no person may be so excused unless he or she would automatically vote against capital punishment regardless of the facts proved. The excusal of the five prospective jurors in the

> "MR. GUTIERREZ: I don't know, sir. I would have to—I would just have to wait. I can't determine it.
>
> "...
>
> "MR. GUTIERREZ: Well, I would be against it until I would hear other circumstances involved.
>
> "THE COURT: All right. Then you are saying that there could be circumstance?
>
> "MR. GUTIERREZ: That would make me change my mind.
>
> "THE COURT: That there could be facts that could come in that would make it such that you could vote for the death penalty.
>
> "MR. GUTIERREZ: Right.
>
> "...
>
> "MR. GUTIERREZ: No.
>
> "THE COURT: .... Would the fact that the death penalty is a possible punishment affect your decision (sic) any question of fact. In other words, could you decide the questions of fact putting aside the fact that the death penalty is a possible punishment?
>
> "MR. GUTIERREZ: It might. In other words, I couldn't be sure. I would hear the facts and—
>
> "THE COURT: Now this is a little different. I'm not asking whether or not you could vote for the death penalty but whether you could decide a fact knowing that the death penalty was a possible punishment if he were convicted.
>
> "MR. GUTIERREZ: I don't know how to answer that. I would have to do some pretty serious thinking about it to say one way or the other. I couldn't come up and say that I could or couldn't.

instant case was upon the basis of their bias or prejudice against a portion of the law upon which the State had a right to rely. The excusals were thus *authorized* by Art. 35.16(b)(3), V.A.C.C.P. The "Witherspoon question" for this Court's consideration was whether the excusals were *forbidden* by the United States Constitution as interpreted in *Adams* and *Witherspoon*, not whence they were authorized.

"THE COURT: Do you think there may be circumstances which you would not be able to decide the facts because the death penalty is a possible punishment?

"MR. GUTIERREZ: Yes."

The sticking point in the voir dire of Gutierrez became whether he could follow an instruction requiring the jury to hold the State to the burden of proving guilt and punishment issues beyond a reasonable doubt, or whether he would require a stricter standard—that of "beyond all doubt."

During further voir dire, counsel for the State attempted to elicit answers showing that Gutierrez was aware of a difference between the "reasonable doubt" and "all doubt" standards, and was nonetheless insistent upon the latter; defense counsel countered with questions attempting to elicit answers showing that Gutierrez was merely affected to some degree in what he would deem to be reasonable in a case involving a possible death penalty.

After examination by the State, the defense, and the court, the State continued:

"Q. In order to clear your conscience, if you were called upon to determine whether or not death should be imposed, to answer the two questions to satisfy Mr. Gutierrez' (sic) conscience, regardless of the other eleven people, but to satisfy Mr. Gutierrez, you would require the State to remove all doubt that he did it deliberately and he was a continuing threat to society before Mr. Gutierrez could vote on these two issues knowing at the time that it would result at the time in sentencing the defendant to death?

"A. Yes.

"THE COURT: When the District Attorney asked you that question he said, 'remove all doubt.' Are you saying remove all reasonable doubt?

"MR. GUTIERREZ: All doubt.

"THE COURT: All right. I sustain the challenge."

Keeping in mind the teachings of *Adams*, supra, that the Constitution would not permit

"... the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt...." 448 U.S. at 50.

we would have substantial doubts about the challenge of a juror whose insistence upon the "all doubt" standard remained ambiguous, especially where, as here, the question triggering exclusion dealt with the punishment issue.

In the instant case, however, appellant's counsel continued the voir dire, and the following exchange occurred:

"MR. MOSTY: Q. Mr. Gutierrez, if you had—If you got upstairs and you had any doubt other than a reasonable doubt, that's the same thing as saying there is no doubt at all, isn't it?

"MR. SUTTON: Your Honor, that's not true.

"MR. MOSTY: I'm asking him—

"THE COURT: He is asking the question. I will allow the question.

"MR. MOSTY: If you get up there and you have a doubt that is unreasonable in your mind, isn't that the same thing as having no doubt at all?

"MR. GUTIERREZ: I would say yes.

"MR. MOSTY: Your Honor, we submit he's qualified.

"THE COURT: Mr. Gutierrez, if in your deliberations in a capital case, the one where a death penalty is a possibility, you had some doubt in your mind that the defendant committed the offense charged—however you classify this in your mind as not being reasonable doubt, could you then return a verdict of guilty?

"MR. GUTIERREZ: Ask me that question again.

"THE COURT: All right. In the deliberation in a capital case where a death penalty is a possible result, you've heard the evidence and you've retired to the jury room, and in your mind you have a doubt concerning the defendant's guilt or innocence, but you classify that doubt in your mind as a non-reasonable or unreasonable doubt, one not based on reason, could you than (sic) find the defendant guilty of the offense?

"MR. GUTIERREZ: If there's any doubt in my mind I could not.

"THE COURT: Whether that doubt was reasonable or unreasonable?

"MR. GUTIERREZ: Yes.

"THE COURT: I'm going to sustain the State's challenge."

The court's question clearly made room for the venire member's own standard of reasonableness, and dealt specifically with the issue of guilt, but Gutierrez still clung to his insistence upon the eradication of all doubt, not only the doubt he himself considers reasonable in the circumstances.

Gutierrez further expressed his understanding of the difference between "reasonable doubt", and "all doubt" standards when, after further examination by defense counsel, the court inquired:

"THE COURT: Let me ask you one other questions. (sic) When you say it's to be clear in your mind, are you saying that you are using the judgment scale that's it's (sic) beyond all doubt or beyond a reasonable doubt?

"MR. GUTIERREZ: Beyond all doubt.

"THE COURT: And those are not synonymous. That's not the same standard?

"MR. GUTIERREZ: No. I don't think so."

■ The examination of Gutierrez showed, not a venire member whose standard for "reasonable doubt" would be stricter in a case involving the death penalty as a possible punishment, but one who, regardless of his *own* standards of reasonableness, would insist that the State offer proof, even at the guilt-innocence stage, beyond all doubt, whether reasonable or not—in short, a juror who has a bias or prejudice against a phase of the law (burden of proof) upon which the State is entitled to rely. Art. 35.16(b)(3), V.A.C.C.P.

The ground of error is overruled.

Appellant next contends the court erred in excusing a member of the jury panel, over objection, because of a hearing problem which caused that member not to be satisfied that he was fit for jury service.[5]

Appellant apparently complains because venire member Hitchcock, in addition to the hearing defect which he had himself brought to the court's attention, had been challenged by the State because of his strong opposition to capital punishment. The court overruled the State's challenge "based on Witherspoon questions", but sustained the challenge under 35.16(a)4.

Art. 35.16(a)4 provides for challenge if, in the discretion of either party, the court *or the prospective juror*, a hearing defect renders that prospective juror unfit.

In the instant case, the juror considered himself unfit on this ground:

"THE COURT: I have one question as to the hearing. Mr. Hitchcock, we have explained the particular situation here. Taking into consideration your hearing I want to know in your own discretion, are you satisfied that you're fit for jury service under these circumstances?

---

5. Art. 35.16(a)4, V.A.C.C.P., provides that a challenge for cause may be made when it is shown that a venire member:

"... is insane or has such defect in the organs of feeling or hearing, or such bodily or mental defect or disease as to render him unfit for jury service, or that he is legally blind and either the court or the state in its discretion or the defendant or the prospective juror in his discretion is not satisfied that he is fit for jury service in that particular case; ..."

"MR. HITCHCOCK: Well, just listening I got the other counsel's name that's standing. I have trouble hearing him. I didn't hear all he said. Now he was looking down reading. I do have problems with him.

"THE COURT: Let me reask my question then. Taking into consideration your hearing difficulty, and in your own discretion, are you satisfied that you are fit for jury service?

"MR. HITCHCOCK: Not under those situations, no."

Hitchcock had stated on voir dire that he had a hearing problem, requesting the prosecutor, who was reading an oath to him, to "read it very loud." Asked about the nature of this problem, Hitchcock continued:

"A. Well, normally I hear you fairly well but there's sometimes if you turn the wrong way—I think maybe it may be associated with tones. There's some people I hear real well and other people I have trouble understanding just exactly. I hear but I do not fully understand the words that they are saying.

. . . .

"MR. HITCHCOCK: There's things that I do miss, yes. And in sitting in the courtroom I was close to the back. Some of the things in the first day that we came in I didn't hear at all that was said.

"THE COURT: Are we talking about a rather large per centage of the proceeding?

"MR. HITCHCOCK: I think I got most of it, but there are parts that I did miss. If there's any noise it will affect this."

■ This explanation, together with the previously noted statement that Hitchcock had trouble hearing one of the trial counsel, demonstrates amply that the decision to grant the challenge was within the discretion of the court; no error is shown.

Appellant also contends the court erred in overruling his motion for mistrial, which was tendered to the court after the alleged misconduct of a juror.

Shortly after the last juror had been accepted and sworn, he had a conversation with his wife and was upset to learn that defense counsel had contacted her to inquire into her husband's view toward the death penalty.

The juror returned to the courtroom and expressed his displeasure to the court. In response to an inquiry by the court, the juror stated that he would not hold it against the defendant, but that he resented having counsel call his wife.

The court immediately called counsel into chambers, and the next day a hearing was held.

At the hearing, appellant requested first that the jury be immediately sequestered prior to the hearing of appellant's motion for mistrial. This request was denied.[6] Appellant next moved for mistrial upon the basis of an unauthorized communication between a juror and a third party.

The court, noting that the balance of the jury panel had not yet been dismissed,[7] offered to grant appellant an extra peremptory challenge to strike the arguably tainted juror and to reopen the voir dire to select a twelfth member.

Appellant first rejected the offer upon the ground that several of the jurors were aware, by way of news media reportage, that a jury had been selected, and that to re-open the voir dire would alert those jurors to something in the wind.

The court then offered to sequester the eleven remaining jurors, separately, immediately upon the exercise of the proffered peremptory challenge.

Appellant's counsel also rejected this offer, asserting that with the swearing in of

---

6. The refusal to sequester the jury at this time has not been assigned as error.

7. It was apparently the intention of the court to select a competency jury, if one was needed, from the remaining venire.

the twelfth juror, the die had been cast, the Rubicon crossed, and the jury etched in stone. Appellant contended, and continues to contend upon appeal, that once twelve jurors had been sworn individually, an indivisible jury had been formed and the only appropriate remedy if one of those jurors had been tainted was to declare a mistrial.

While it is true that, once a jury has been impaneled resort to further voir dire and replacement of a member would be error, it appears that in the instant case the jury had not been sworn as a whole.

The swearing in of a juror does not lock that individual forever into the jury. In *Sanne v. State*, 609 S.W.2d 762, 769 (Tex. Cr.App.1980), this court overruled the rule of *Ellison v. State*, 12 Tex.App. 557, 580 (1882), that

"'... [A]fter a juror has been once impaneled in a felony case, it is beyond the power of the court to excuse him from serving in the case, and that in case of sickness or accident rendering it impracticable to proceed with the trial of the case before the jury as then constituted, the court shall discharge that jury and proceed to form another for the trial of the case.'"

The court in *Sanne* held it proper to excuse a sworn juror for cause where the juror was disqualified and the jury had not yet been completed. The court went on to state that, under the circumstances, no jury had been impaneled.

■ In the instant case, twelve jurors had been chosen, but, like the jurors in *Sanne*, they had neither met together nor taken the oath together. No opportunity had existed for any taint to pass from one juror to another or to the jury as a whole. We hold that, where the jury has neither been sworn together nor met as a body, the jury has not been impaneled and there is no error in excusing a juror who has been individually sworn but is thereafter shown to be disqualified.

■ In the circumstances of the instant case, the court's offer of an additional peremptory challenge to the defense, combined with the court's offer to sequester the jurors as individuals immediately upon exercise of such challenge, provided appellant with an adequate remedy for the expressed resentment of this juror; it was not necessary to declare a mistrial, strike the jury panel, and begin the voir dire process again as appellant contends.

The ground of error is overruled.

Appellant also contends the court erred in allowing the State to present, over appellant's objection, evidence that appellant had committed extraneous offenses. In order to illuminate the questions of whether the admission of such evidence was error, and, if so, whether that error was harmful to appellant, we shall set out pertinent portions of the evidence adduced at trial:

Roger Stotts testified that on June 16, 1979, he was employed at the concession stand at the Bolero Drive-in Theater in Kerrville. On that day he arrived at work, as usual, with his mother, Betty Stotts, who was the theater's ticket seller.

Stotts testified that he was present when his mother opened the ticket booth, and that at that time he observed the booth's money tray, which the Stottses carried to the booth. Stotts testified further that his mother's car, a red Hornet station wagon, was parked near the ticket booth when he returned to the concession stand after the opening of the ticket booth.

Stotts next saw the car in front of the concession stand later in the evening:

"Someone came into the concession stand and said, 'The ticket booth is on fire'. So I ran outside and I seen the car and I stopped. I ran over to the car and I looked in the passenger side. The window was down. I looked in and I seen a man on the driver's side. He was wearing cut-offs and I seen dried blood on his right knee.

. . . .

"Q. Did you have any conversation with him?

"A. I asked him what he was doing. He said, 'I'm just looking for someone'.

"Q. And what happened then?

"A. He drove off."

Stotts identified appellant as the person he saw driving his mother's car.

Stotts testified that he ran to the box office after appellant drove off:

"I seen the box office was really burning. It was fire in it glowing red. The door was locked and I didn't see my mother nowhere around."

The Bolero's manager, Howard Hiegel, testified that the money tray contained one hundred dollars when Mrs. Stotts took it to open the booth, and that, from his observation of the number of cars at the drive-in and the crowd at the concession stand, he estimated the evening's "take" from ticket sales to be approximately $600.

Upon receiving reports of the ticket booth's being on fire, Hiegel telephoned the police and fire departments. Shortly thereafter he could see, from the doorway of the concession stand, a fire blazing up from the ticket booth.

Upon seeing the flames, Hiegel ran to the booth, where he observed the fire department putting water on the burning structure. When the firefighters worked their way around the booth to the side with the door, Hiegel unlocked and opened it. The firefighters played their hose on the flames inside, and the booth filled with smoke. When the smoke cleared, a body was visible on the floor of the booth.

Hiegel also testified that he was not acquainted with appellant and had not employed him, and that he never gave appellant permission to take money from the box office.

Sharon Schoettle, a physician from Houston, attended the Bolero upon the night of the murder, accompanied by her then-future husband, Jack Apple, Jr.

Appellant was in the ticket booth when Schoettle arrived at the theater, and ". . . saliva was running out of the side of his mouth. He appeared to be high on some type of drugs." A light haze of smoke was visible within the booth. As Apple inquired of the movie titles and prices (questions which appellant answered correctly after looking at the marquee), the smoke became thicker.

Appellant, upon inquiry about the smoke, replied that he had dropped his cigarette; he then bent down in the booth and apparently was able to disperse some of the smoke.

Apple testified, essentially corroborating the testimony of Schoettle, but was not able to positively identify appellant as the person in the booth.

Memory Dawn Gordy, accompanied by her cousin Lorna Powell, attended the Bolero, arriving at about 10:50. Gordy stated that appellant, who was standing outside the ticket booth, took the $5 bill proffered by Gordy and gave Gordy $3 change ($1 in excess of the correct amount). Appellant obtained the change money from a wad of money that had been in his pocket. At that time the ticket booth was on fire and smoking. When Gordy brought this to appellant's attention, "He said, 'It was an electrical short cut.'" [sic] Appellant had blood on his left leg when Gordy saw him; she testified that the blood was "runny".

Ronald John Barton, who had been acquainted with appellant prior to the murder, attended the Bolero. Barton testified that during the intermission between movies:

"I saw [appellant] coming up to the side. I was just standing there and I said, 'Woolls, what do you know?' And he stopped and he looked at me and he said, 'R.J., I been drinking a little whiskey all day.' He said, 'I got a flat about half a mile down the road I got to fix.' I said, 'Well, take it easy', and he walked off."

. . . .

"Q. Did you notice whether or not Randy Woolls was carrying anything?

"A. Yes, sir, I did.

"Q. And what, if anything, did you see him carrying?

"A. He had a small tire tool about approximately that long. (Indicating.) And a handkerchief or a piece of white cloth wrapped around it."

Barton identified State's Exhibit #7, a tire tool found beneath the victim's body, as the same as or similar to the one appellant carried.

Barton noticed smoke around the ticket booth area approximately 20 minutes after encountering appellant.

Testimony by various officers involved in investigating at the scene establishes that appellant was found, shortly after the discovery of the victim's body inside the burnt-out ticket booth, sitting inside the victim's automobile, which had been moved to a place within the drive-in theatre.[8]

Officer Fackleman, who searched appellant, found in his pockets a wad of money, a coin purse, a calculator, a lighter, a set of keys, a gas receipt in the victim's name, and a yellow-handled pocket knife. The knife appeared upon inspection to have blood on it, as did some of the money. The total amount of money found on appellant was $606.62.

Joe Ronald Urbanovsky, a forensic chemist, testified that he tested the money and found it to have been stained by human blood of undeterminable type. Urbanovsky found that the knife had type O human blood on it, and the tire tool was also stained with blood, but of an undetermined type and origin. Urbanovsky also tested a sample of blood which had been drawn from the victim's body, and found it to be type O.[9]

Traces of human blood were also found on the clothing worn by appellant, but their type could not be determined. The same result obtained with scrapings taken from appellant's hands upon his arrest.

Dr. Ruben Santos, a forensic pathologist, testified that the cause of the victim's death was a combination of: a crushing injury to the skull; aspiration of blood, and possibly a pulmonary embolism, caused by severance of the jugular vein; cuts of wrists; burns of four degrees to 30% of the body, including the face, head, shoulders and extremeties; inhalation of carbon monoxide; and, secondary to the cuts and other injuries, massive bleeding. Santos stated that those injuries were independently sufficient to have caused death.

None of the testimony described above is the object of appellant's instant contention; appellant's objection is to portions of the testimony of three persons, who were his companions on the day of the murder, that show appellant participated in offenses extraneous to the one at bar.

Lori Alanis testified that she, her husband Randy Alanis, and appellant were together at the Alanis' home the night before the day of the murder, and that Randy Alanis and appellant had left together, returning at about 11:30 or 12 that night. In response to the prosecution's inquiry about what the trio had done after the return of Randy Alanis and appellant, Lori Alanis testified as follows:

"A. What did we do?

"Q. Yes.

"A. Did some drugs.

"Q. What kind of drugs?

"A. Valium.

"Q. And who had the valium?

"A. Randy Lynn Woolls.

"Q. Randy Lynn Woolls had it?

"A. Yes, sir.

"Q. Had you seen any earlier in the evening?

"A. No, sir.

"Q. Have you ever used valium before?

"A. No, sir.

"Q. Okay. And how much did you use?

"A. I couldn't tell you. Maybe two or three times.

"Q. And now when you say, 'you did some drugs', what do you mean 'you did some drugs'?

"A. I did some drugs.

"Q. Well, how did you do it?

"A. By injection.

---

**8.** Two civilian witnesses also saw the victim's car take a place inside the theatre compound shortly before the arrest and witnessed the arrest itself.

**9.** Appellant's blood was shown to be type B.

"Q. Okay. And who had the syringe?

"A. Randy.

"Q. Randy Woolls?

"A. Randy Woolls.

"Q. Okay. If you will, during the course of our visiting here, either designate Randy Woolls or Randy Alanis so that we won't get them confused. Now where did he have these drugs?

"A. In his hand.

"Q. And describe what the liquid valium comes in, as you recall.

"A. As I remember it come in a brown bottle.

"Q. Okay. Was it a small or large bottle?

"A. Small. About this big. (indicating.)

"Q. Okay. Do you know how much was in a bottle?

"A. I have no idea.

"Q. Okay. Do you recall how many shots would come out of each bottle?

"A. No.

"Q. Okay. How many syringes did he have?

"A. Five.

"Q. Were they all the same size?

"A. Yes, sir.

"Q. Okay. Do you know how much each of those syringes would hold?

"A. No, sir.

"MR. MOSTY: Your Honor, we are going to object to this whole line of questioning for the reason that it has been gone into by the State in violation of the Court's order heretofore mentioned pursuant to a motion to the defense.

"THE COURT: Have we got a motion in limine concerning this?

"MR. MOSTY: There is a motion in limine that specifically refers to this. At this time we ask that the jury be instructed to disregard all that testimony and that a mistrial be granted at this time.

". . . .

"THE COURT: It appears that the motion in limine goes to whether it's charged or convicted.

"MR. MOSTY: Nevertheless, Your Honor, it's inadmissible. An extrenuous (sic) offense."

■ The objection was made only after fairly extensive testimony had been given upon the instant extraneous offense. To preserve error, an objection must be made at the first opportunity. *Crocker v. State*, 573 S.W.2d 190 (Tex.Cr.App.1979); *Garcia v. State*, 573 S.W.2d 12 (Tex.Cr. App.1978). Neither does a motion in limine preserve error absent a timely objection. *Romo v. State*, 577 S.W.2d 251 (Tex.Cr. App.1979).

■ Both Lori Alanis' husband Randy and Shirley Wimberly, an acquaintance of Woolls and the Alanises, also testified to the group's use of valium on the night before the murder. That testimony was admitted over timely objection, but, where the same evidence is properly admitted elsewhere in the trial, as in the instant case by Lori Alanis's testimony, no reversible error is shown. *Boles v. State*, 598 S.W.2d 274 (Tex.Cr.App.1980); *Crocker v. State*, supra. Insofar as this multifarious ground of error addresses the admission of testimony of appellant's use of valium on the night before the murder it is overruled.

In the same ground of error appellant contends the court erred in admitting certain testimony of his companions relating to the night of the murder.

Lori Alanis testified that she, her children, Randy Alanis, Shirley Wimberley and appellant had gone together in appellant's car to the Bolero Drive-in on the night of the murder. Alanis testified, over objection, that shortly after their arrival appellant stated to Randy Alanis "there's a veterinary clinic across the street where we can get drugs", and asked Randy Alanis to go with him. After that incident, Alanis did not see appellant again that night.

Randy Alanis testified that appellant asked him to burglarize the Veterinary clinic with appellant in order to "score some

drugs and make some money." Appellant then went to the trunk of his car, found a hammer, said he could do better work with a tire tool, found a tire tool, and again asked Alanis to go with him. Alanis refused, and appellant said "Well, to hell with you," and walked off in the direction of the concession stand carrying the tire tool.

Shirley Wimberly testified that while at the Bolero she took from appellant a syringe which was visible in appellant's pocket and also a bottle of liquid valium. Having seen a person in a black T-shirt arrested later in the evening, and appellant not having returned to the automobile, she and Lori Alanis destroyed the syringe and the valium upon returning to the Alanis home.

Soon after having seized the syringe, Wimberly went with the Alanis baby to the concession stand; Randy Alanis followed shortly thereafter.

The testimony of appellant's companions shows that it was shortly after his syringe and valium bottle were taken that he asked Randy Alanis to accompany him to the veterinary clinic for drugs, and it was for the purpose of effecting the burglary of the clinic that he obtained from his car trunk the tire tool, matching the one found underneath the victim, which he was seen to carry as he left the company of his companions shortly before the murder took place.

■■■■ Evidence which might otherwise be inadmissible as showing the commission of an extraneous offense may properly be admitted where it is necessary "[t]o show the context in which the criminal act occurred ... under the reasoning that events do not occur in a vacuum and the jury has a right to hear what occurred immediately prior to ... the commission of that act so that they may realistically evaluate the evidence." *Albrecht v. State*, 486 S.W.2d 97, 100 (Tex.Cr.App.1972). The evidence of appellant's actions at the Bolero Drive-in was such evidence. Insofar as it relates to that evidence, the ground of error is overruled.

Appellant's remaining contention under this ground of error is that the court erred in admitting the testimony of his companions that appellant, with his companions, had used valium and marihuana on the day of the murder.[10]

Appellant's extensive use of drugs during the daytime was arguably unrelated to the context of the murder that took place that night, and proper objection was taken to the questioning. But even assuming, arguendo, that the admission of such evidence was error, it was not reversible error if the evidence of appellant's guilt is so overwhelming that there was not a reasonable probability that the improper evidence might have contributed to appellant's conviction.[11] *Bass v. State*, 622 S.W.2d 101 (Tex.Cr.App.1981).

■■■■ Appellant was seen walking with a tire iron, like the one found underneath the victim, shortly before the murder; then in the smoking ticket booth where the victim was later found; then just outside the booth, with what appeared to be blood on his leg, carrying a wad of bills.[12] Appellant was then seen by the victim's son to be

---

**10.** The court disallowed testimony that appellant had possessed a quantity of marihuana, but allowed testimony about the use of marihuana because appellant's counsel had inquired of the witnesses about appellant's condition, specifically whether he appeared intoxicated, and marihuana use was relevant to that condition. Our disposition of this issue renders unnecessary a discussion of whether appellant's counsel's emphasis on appellant's intoxication throughout the cross-examination of most of the State's witnesses in an effort to establish intoxication as a mitigating factor on punishment opened the door for a complete explication of the source of the intoxication.

**11.** In the instant case we need not consider whether the evidence of the extraneous offense might have had an effect upon the punishment assessed because such evidence is admissible on punishment in capital murder prosecutions. *Rumbaugh v. State*, 629 S.W.2d 747 (Tex.Cr.App. 1982).

**12.** Testimony established that appellant, having left his wallet behind, was without money upon his arrival at the Bolero.

driving the victim's car, and shortly thereafter found inside it by the police; blood scrapings from appellant matched the blood of the victim, and he was found with a large amount of money consistent with the Bolero's receipts. The evidence of guilt was overwhelming, and it is inconceivable that the evidence of appellant's use of valium earlier in the day contributed to the jury's verdict. The error, if any, was harmless.

■■■ Appellant next contends that Article 37.071, Penal Code [sic] [13] is unconstitutionally vague and grants to the jury unbridled discretion in assessing the death penalty. We have considered and rejected this contention repeatedly. *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr.App.1980); cert. denied 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996; see, e.g. *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979), cert. denied 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980); *Brock v. State*, 556 S.W.2d 309 (Tex.Cr.App.1977), cert. denied 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498, reh. den. 434 U.S. 1051, 98 S.Ct. 964, 54 L.Ed.2d 805. The ground of error is overruled.

■■■ Appellant contends finally that the death penalty constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. This contention was rejected by the United States Supreme Court in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), rehearing denied 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 158. It has been rejected by this Court. *Gholson v. State*, 542 S.W.2d 395 (Tex.Cr.App.1976), cert. den. 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084, reh. den. 434 U.S. 882, 98 S.Ct. 247, 54 L.Ed.2d 166. The ground of error is overruled.

The judgment is affirmed.

13. We assume appellant refers to V.A.C.C.P., Art. 37.071.