Calvin Joseph WILLIAMS, Appellant,

v.

The STATE of Texas, Appellee.

No. 68879.

Court of Criminal Appeals of Texas, En Banc.

Dec. 5, 1984.

Rehearing Denied July 24, 1985.

Craig A. Washington, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and William J. Delmore, III, and Ned Morris, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

Appellant was convicted of capital murder. The special issues required under Article 37.071(b), V.A.C.C.P., were submitted to the jury and were answered in the affirmative. Punishment was assessed at death. We affirm.

In his first ground of error, appellant contends the trial court erred in admitting into evidence the unlawfully obtained confession of the appellant. Appellant contends the confession was involuntary because there was an unreasonable delay in bringing the appellant before a magistrate after his arrest and that during this delay the appellant was given little food and subjected to physical abuse which deprived the

appellant of the ability to make a knowing and intelligent waiver of his rights.

The record reflects that the body of the victim was found in her boyfriend's home on the evening of June 2, 1980. Appellant was arrested near his home on June 4, 1980, at around 7:15 a.m. Appellant signed a three page written confession to the offense shortly before 8:00 p.m. that same day. It is undisputed that the appellant was not taken before a magistrate until after the confession was signed.

Appellant's claims of physical abuse stem from his testimony at the *Jackson v. Denno* [1] hearing that during his arrest Detectives Kent and Waltman grabbed his injured arm [2] and slammed his head into the wall of a house. He claims that while he was handcuffed and sitting in the back seat of a car, Kent, who was driving, turned around several times, reached back, and hit and shook appellant. According to appellant, the officers stated that if appellant did not tell them the location of the victim's car, they would continue to hit him. Once they arrived at the police station, Kent again shook him, kicked him in the groin, and pulled hair from appellant's head, stomach, and pubic areas before finally placing him in the city jail. Several hours later, when Detective Binford removed appellant from the jail, Binford's partner, Detective Anderson, told appellant that if he did not confess, they were going to continue to "jump" on him. Because he was afraid he was going to be injured, appellant testified he discussed the case with Binford.

In addition, the defense called a woman who testified that on the morning of appellant's arrest she heard a bumping noise on her porch. When she investigated, she discovered that appellant was being arrested by a couple of officers. She heard him tell the officers not to hurt him because he had been shot.

1. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

2. Appellant testified that he had been the victim of an aggravated robbery a couple of weeks

before the instant offense and had been shot in the chest and arm. One of the bullets was still in his arm at the time of his arrest.

During the suppression hearing and before the jury,[3] Detective C.W. Kent testified that on the morning of appellant's arrest, appellant had run from the officers several times before he was finally apprehended at around 7:15 a.m. on the porch of a house near appellant's home. Appellant resisted the arrest; a struggle ensued; and it took both officers to subdue and handcuff the appellant. Kent testified that although he never deliberately pushed appellant up against the house, he did have to struggle with him before subduing and handcuffing him. Appellant was first driven to his mother's home where a pair of trousers were obtained. With appellant and Detective Waltman riding in the back seat of the car, Kent then drove around for an hour or so looking for the victim's car, which the police officers believed would be located a short distance away.

After unsuccessfully searching for the victim's car, Kent testified the trio arrived at the police station around 8:30 or 9:00 a.m. Before placing appellant in the city jail, Kent talked to appellant for awhile and obtained hair samples from appellant in order to compare them with the hairs found on the body of the victim, a procedure Kent claimed was not unusual in a case involving a possible rape. Kent also accompanied appellant to the crime lab where a saliva specimen was taken. Although municipal judges were on duty next door, Kent never took appellant before the magistrates nor did he ask if appellant had eaten breakfast. Appellant was placed in the city jail about 3 hours after getting to the police department. Kent testified he *never* hit the appellant nor put him in any pain other than what was necessary in the initial attempt to subdue and arrest him.

Detective J.H. Binford also testified before the jury and at the suppression hearing. On the day of appellant's arrest, Binford checked appellant out of the city jail at about 5:00 p.m. Shortly after beginning the interview, Binford's partner, Detective Anderson, mentioned that the jail was serving its evening meal and appellant would miss his supper, so Anderson left the police station and returned later with a hamburger, french fries, and soft drink which appellant ate while talking to the officers.

Binford testified Appellant talked freely about the offense and made an oral confession approximately one hour after beginning the interview. Binford proceeded to obtain the written confession which was admitted at trial. Appellant began dictating the first page of the statement at 6:14 p.m., the second at 6:46 p.m., and the third at 7:13 p.m.[4] When the statement was completed, appellant read it aloud and signed it before three civilian witnesses: two newspaper reporters and a clerk, each of whom questioned appellant about the conditions leading to the confession and any possible improprieties.

---

3. The issue of voluntariness was also an issue before the jury as well as in the suppression hearing.

4. Before transcribing appellant's statement, Binford required that appellant read aloud the list of rights at the top of the first page and acknowledge his understanding of the same by initialing each. As appellant confessed, Binford would type the statement. When it was necessary to continue the statement on another page, appellant again read aloud the rights listed at the top of the second page and initialed each. Each page began with the following statement:

"Statement of CALVIN JOSEPH WILLIAMS taken in Harris County, Texas.

"Prior to making this statement I have been warned by JH BINFORD, A POLICE OFFICER FOR THE CITY OF HOUSTON, the person to whom this statement is made, that;

"1) I have the right to remain silent and not make any statement at all and any statement I make may and probably will be used against me at my trial;

"2) Any statement I make may be used as evidence against me in court;

"3) I have the right to have a lawyer present to advise me prior to and during any questioning;

"4) If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning and;

"5) I have the right to terminate the interview at any time.

"Prior to and during the making of this statement I knowingly, intelligently and voluntarily waive the rights set out above and make the following voluntary statement: ...."

Binford testified he thought appellant had already been taken before a magistrate earlier in the day by other officers. It was only after the instant confession, when he believed appellant might confess to other offenses, that he learned that appellant had not been before a magistrate and thus arranged for the magisterial warnings. Binford denied that force or any type of mental duress was used at any time to persuade appellant to confess. He stated he believed appellant confessed because he realized he was caught and was attempting to put the offense in the best possible light.[5]

Detective R.D. Anderson testified he was present during some of the interrogation, including when appellant was warned by Binford. Anderson denied ever threatening appellant or witnessing any force, undue influence, or pressure being exerted against appellant. He also testified that he brought appellant some food when he realized appellant would be missing the evening meal at the jail. He stated appellant appeared to be calm throughout the interview.

All three of the civilian witnesses testified. Maureen Lincoln, a clerk at the police department, testified appellant read the statement aloud and was calm and articulate. She asked him if he had been promised anything or abused in any way or if he was being forced to sign the statement. She also asked whether he had been given cokes or cigarettes and remembered that he had been fed. Appellant was not handcuffed while she was present and made no complaint of any injuries. She observed no signs of any pressure or undue influence being used.

John Varboun, a reporter for the Houston Chronicle, also witnessed the statement. He testified appellant read the confession aloud and appeared to understand it—he even corrected a couple of typographical errors before signing it. There was no evidence that appellant had been harassed or was under any undue mental strain. In fact, appellant appeared to be almost casual about the confession, reading it in a monotonous tone. Varboun recalled that appellant had just eaten and that Binford instructed appellant to tell the witnesses if there was any undue coercion. Varboun asked appellant if the statement was in appellant's own words and another witness asked if any promises had been made to induce the confession. Varboun testified he observed no signs that appellant was injured.

Mike Avalos, a reporter with the Houston Post, testified he also was a witness to appellant's confession. He heard appellant read the statement and saw him sign each page. Avalos saw no evidence that appellant was suffering from any stress or that he had been subjected to any force.

The trial court found appellant was properly warned by Binford before making his confession; knowingly, intelligently, and voluntarily waived his rights; and made the statement freely and voluntarily without compulsion or persuasion. The thrust of appellant's argument on appeal is that his confession was involuntary because the unreasonable delay in bringing him before a magistrate resulted in his being subjected to physical abuse by the officers which in turn deprived him of the ability to knowingly and intelligently waive his rights.

Article 15.17, V.A.C.C.P., requires that "the person making the arrest shall without unnecessary delay take the person arrested or have him taken before some magistrate of the county where the accused was arrested." It is well established, however, that Art. 15.17 relates to the duties of the arresting officer and the magistrate, and failure to comply with the statute does not automatically invalidate a confession. *Shadrick v. State*, 491 S.W.2d 681 (Tex.Cr.App.1973); *Easley v. State*, 448 S.W.2d 490 (Tex.Cr.App.1970). Absent a showing of a causal connection between an accused's confession and the failure to take the accused promptly before a magistrate,

---

**5.** Indeed, appellant in his confession essentially stated that the victim, a total stranger to the appellant, invited her sexual assault and murder.

the validity of the confession is not affected. *De La Rosa v. State*, 658 S.W.2d 162 (Tex.Cr.App.), *cert. denied*, — U.S. —, 104 S.Ct. 201, 78 L.Ed.2d 175 (1983); *Waller v. State*, 648 S.W.2d 308 (Tex.Cr.App. 1983); *Von Byrd v. State*, 569 S.W.2d 883 (Tex.Cr.App.1978), *cert. denied*, 441 U.S. 967, 99 S.Ct. 2418, 60 L.Ed.2d 1073 (1979); *Myre v. State*, 545 S.W.2d 820 (Tex.Cr.App. 1977); *Hester v. State*, 544 S.W.2d 129 (Tex.Cr.App.1976); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976), *cert. denied*, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977); *Easley*, supra; *Shadrick*, supra.[6]

In the instant cause, appellant contends the delay resulted in his suffering physical abuse which deprived him of the ability to knowingly and intelligently waive his rights, which in turn caused him to make a statement against his will. In his appeal, appellant fails to articulate in what way the absence of a magistrate's warnings was connected to the physical abuse appellant claims he suffered prior to confession, and we can discover none.

Moreover, even if we were to hold that presentation before a magistrate could somehow have prevented the physical abuse appellant claims he suffered prior to his confession, we would first have to find that the trial court abused its discretion in finding that appellant confessed voluntarily without coercion or force. Contrary to appellant's claims on appeal, the evidence was undisputed that appellant was fed prior to making the confession and the record is silent as to when appellant's previous meal had been. The threats and acts of violence appellant claimed caused him to sign the confession were completely denied by the officers involved. See *Alonzo v. State*, 591 S.W.2d 842 (Tex.Cr.App.1980); *Myre*, supra. No other witness in any manner corroborated appellant's claims. Moreover, appellant told the witnesses to the confession that the statement was being made voluntarily, free of any coercion, promises,

or threats. In addition, the officers testified that appellant was completely and accurately warned of his statutory and *Miranda*[7] rights numerous times prior to his statement.

■ Thus, at most, the evidence in the instant case raised issues of fact. The trier of fact is the sole judge of the weight and credibility of the witnesses and may believe or disbelieve all or any part of any witness' testimony. *Waller*, supra; *Darden v. State*, 629 S.W.2d 46 (Tex.Cr.App.1982); *Alonzo*, supra; *Harville v. State*, 591 S.W.2d 864 (Tex.Cr.App.1979); *Myre*, supra. Under the totality of the circumstances, we find that there is evidence to support the finding that appellant had been fully appraised of his rights and affirmatively waived those rights, that he was neither forced nor coerced into making a statement, and that the delay in taking appellant before a magistrate was in no way causally connected to appellant's confession. See *Waller*, supra; *Darden*, supra; *Harville*, supra; *Honea v. State*, 585 S.W.2d 681 (Tex.Cr.App.1979); *McMahon v. State*, 582 S.W.2d 786 (Tex.Cr.App.1978); *Short v. State*, 511 S.W.2d 288 (Tex.Cr. App.1974); *Hester*, supra; *Shadrick*, supra.

Appellant's first ground of error is overruled.

In his second ground of error, appellant contends the trial court erred "by its systematic exclusion from the jury of prospective jurors who voiced general reservations against imposition of the death penalty." Specifically, appellant asserts that veniremen Gill and Dunn were improperly excused for cause in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Upon examination by the prosecuting attorney, prospective juror Gill first indicated that he did not "go along with death in any case," even when considering the hypothet-

---

**6.** Even a lengthy delay in bringing an accused before a magistrate is not by itself enough to show a causal connection. See, e.g., *Shadrick*, supra, wherein there was a delay of ten or eleven days, but no causal connection was shown.

**7.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

ical of a defendant who "goes around killing little kids for money." The prosecutor questioned further whether Gill could ever consider death in any case, no matter what facts were presented. Gill responded, "I don't think I could. Not death." When pressed by the prosecutor for a more definite statement, the following colloquy occurred:

"Q. In other words, you could not be part of a jury that could reach that verdict if you felt that that verdict was going to be the result of somebody getting death?

"A. I don't think I would be. My vote would be to give nobody death.

"Q. No matter what the facts were?

"A. No matter what the facts was. I just—I don't know that there could be a fact that would be that severe...."

Venireman Gill then related that his brother had been killed under suspicious circumstances, but it was his feeling that all punishment was the Lord's job. Again he reiterated that he did not "go along" with the death penalty.

The prosecutor then explained Texas' bifurcated trial procedure and the special issues the jury is required to answer in the punishment phase of a capital murder trial. The prosecutor continued questioning.

"Q. ... Do you think that you could answer those [punishment] questions yes, knowing that the result of your answers, if everybody else on the jury agreed with you, would be that the defendant would get the death penalty?

"A. I don't think I could.

"Q. All right.

"A. I think I couldn't—

"Q. Are you telling us that you couldn't or you think you couldn't?

"A. If it—if it's causing a death, no, ma'am, I couldn't.

"Q. You couldn't?

"A. No ma'am."

The prosecutor then explained that jurors are required by their oath to render a true verdict according to the law and the evidence. She then asked:

"Q. So you would answer these questions automatically no to ensure that the defendant would not get the death penalty?

"A. I couldn't answer—I couldn't answer no question where it was giving nobody the death penalty.

"Q. Well, that would be the effect of your answer. In other words, if they were answered yes, he would get the death penalty. If they were answered no—either one of them answered no—he would get a life sentence.

"A. I would have to answer no.

"Q. Regardless of the evidence?

"A. Yes ma'am."

The prosecutor moved to challenge venireman Gill for cause. Appellant's counsel then attempted to rehabilitate the prospective juror. Appellant's counsel asked Gill whether he would follow his oath and truthfully render a verdict regarding the appellant's guilt or innocence. Gill responded that if the evidence was clear that appellant was guilty, "I'd have to say he's guilty." After again explaining the bifurcated trial procedures and the special issues submitted to the jury in capital cases, defense counsel queried:

"Q. ... My question is: Is your feeling about the death penalty so strong that you would go back on the oath that you took to be truthful or, no matter how bad it made you feel down inside, tell the truth?

"A. You mean I have a choice of saying yes or no, giving—what if I say no? That's breaking the law?

"Q. If you know the answer should be yes and you say no, you're violating your oath. Would you agree with me? If you knew beyond a reasonable doubt that the truthful answer to the question should be yes and you answered it no, just to save his

life, you wouldn't be telling the truth on your oath; would you?

"A. I guess not. But I still don't see I could give nobody death."

At this point, the State renewed its challenge for cause, and the trial court sustained the challenge over defense counsel's exception.

Venireman Gill stated that he could not answer the special punishment issues "yes" knowing that the result of his answers would be the imposition of the death penalty. He further stated that he would have to answer the special punishment issues "no," regardless of the evidence adduced at trial. Even though Gill did state that he would be able to render a true verdict regarding the appellant's guilt or innocence, he was unable to consider the penalty issues in the same impartial manner.

■ The Supreme Court held in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980):

"If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the Witherspoon doctrine when it excludes prospective jurors who are unable to unwilling to address the penalty questions with this degree of impartiality."

We hold that venireman Gill was unable or unwilling to consider the statutory special issues with the degree of impartiality to which the State was entitled. *Adams*, supra. See, *Kelly v. State*, 669 S.W.2d 720 (Tex.Cr.App.1984); *Meanes v. State*, 668 S.W.2d 366 (Tex.Cr.App.1983); *Woolls v. State*, 665 S.W.2d 455 (Tex.Cr.App.1983); *Jernigan v. State*, 661 S.W.2d 936 (Tex.Cr. App.), *cert. denied,* — U.S. —, 104 S.Ct. 436, 78 L.Ed.2d 368 (1983). Venireman Gill was properly excluded pursuant to Art. 35.16(b)(3), V.A.C.C.P.

Venireman Dunn stated that he had reservations about participating in this case

due to the fact that he had sons of his own about the same age as appellant. He further stated that he had conscientious, religious, or moral scruples against the imposition of the death sentence. When posited with the hypothetical of a man who "takes a hatchet and hacks up five little babies" for money, Dunn responded, "As far as myself is concerned, I just don't feel that I could render a death sentence."

The prosecutor then explained the special issues that are submitted to the jury at the punishment stage of a capital murder trial. Thereafter, the prosecutor's questioning continued.

"Q. Okay. You know what the effect of these answers is going to be; don't you? If they're yes, it's going to be death. If it's no, it's going to be life. Okay. Would you tend to want to answer those questions no, knowing that your answer of no would be that this man would get a life sentence rather than the death penalty, since you don't believe in the imposition of the death penalty?

"A. I would answer that no.

"Q. Now, I couldn't hear you.

"A. All right. That's like you said. Since I don't believe in the death penalty, I would answer it no.

"Q. And is that regardless of what kind of evidence we put on at the punishment stage of the trial? In other words, it wouldn't make any difference what kind of evidence we put on—would it—

"A. No.

"Q. —because you don't want to see him get the death penalty; you don't believe in the death penalty.

"A. That's mostly—I just don't believe in it; not in particular, him; I just don't believe in it.

"Q. For anybody.

"A. Right."

The prosecutor moved to challenge venireman Dunn for cause. Appellant's counsel then attempted to rehabilitate the

prospective juror by asking "if the evidence persuaded you beyond any reasonable doubt that he was guilty of what he was charged with, you could find him guilty; couldn't you?" Venireman Dunn responded "Sure." Appellant's counsel then turned to an explanation of the bifurcated trial process and the submission of special issues in capital murder cases. Counsel next emphasized the State's burden of proof in criminal cases, and the fact that jurors are required by their oath to render true verdicts according to the law and the evidence. Appellant's counsel then asked:

"Q. My question is: Being a Christian man, if you took an oath as a juror to render a true verdict according to the law and the evidence and you knew from the evidence beyond a reasonable doubt that the guy was guilty and, therefore, you found him guilty and you knew from the evidence beyond a reasonable doubt, Mr. Dunn, that it was done deliberately—that was proven to you, to your satisfaction; so you determine whether you're convinced beyond a reasonable doubt—nobody else can—but you knew in your heart and your mind that it was proven to you—that these lawyers have done their job and 'I'm convinced'—you tell yourself, 'I'm convinced beyond a reasonable doubt from the evidence that it was done deliberately and my answer should be yes; my answer should be yes; I'm convinced beyond a reasonable doubt,' would you answer that yes or no?

"A. I would answer it yes.

"Q. If you were convinced beyond a reasonable doubt from the evidence

that the guy that you had convicted of doing this crime was going to be a menace to society, that he was going to commit criminal acts of violence in the future and he was going to continue to constitute a continuing threat to society and Judge Walker put that question to you and you were convinced from the evidence beyond a reasonable doubt and you knew in your heart and your mind, according to your oath as a juror, that your answer should be yes, would you answer the question yes or no?

"A. Well, you see, in my own conviction, I think there's other ways of keeping a person away from society besides killing.

"Q. Yes, sir.

"A. This is my own conviction.

"Q. Yes, sir.

"A. I'm still against taking a person's life. I feel like there's other means of keeping a person out of society without killing a person."

Thereafter, appellant's counsel phrased the question in another way:

"Q. ... The ultimate question is—and the judge is the one that really needs to know: Are you going to twist the truth in order to make it come out the way you feel because of the way you feel about the death penalty?"

At this time, the prosecutor objected on the ground that this question had already been asked and answered, and the State renewed it's challenge for cause. The trial court then excused venireman Dunn over defense counsel's exception.[8]

---

8. Although not asserted as a separate ground of error, appellant complains in his brief that the trial court *prematurely* excused veniremember Dunn since the last question propounded was never answered. The trial court may impose reasonable restrictions on the exercise of voir dire examination. Duplicitous questions may, within the court's discretion, be limited to curb the prolixity of what can become the lengthiest part of a criminal proceeding. *Bodde v. State*, 568 S.W.2d 344, 350 (Tex.Cr.App.1978), *cert. de-*

*nied*, 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979). Furthermore, no reversible error is shown when the record reflects that the veniremember was, as here, questioned at length and unequivocally stated that he could not vote for the death penalty under any circumstances. *White v. State*, 629 S.W.2d 701, 706 (Tex.Cr.App. 1981), *cert. denied*, 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982); *Burns v. State*, 556 S.W.2d 270, 276–278 (Tex.Cr.App.), *cert. denied*,

Venireman Dunn first indicated that he did not believe in the death penalty, and he would answer the special issues "no" in accordance with his beliefs, regardless of the evidence adduced at trial. When rehabilitated by the defense counsel, Dunn stated that he could render a true verdict regarding appellant's guilt or innocence, and he would answer "yes" to the deliberateness issue if the evidence proved it beyond a reasonable doubt. When defense counsel questioned Dunn regarding the second punishment issue, however, Dunn reiterated his opposition to the death penalty saying "I think there's other ways of keeping a person away from society besides killing."

▮▮▮▮▮ Based on the entire record before us, we conclude that venireman Dunn was properly excused under Art. 35.-16(b)(3), V.A.C.C.P. He was unable or unwilling to consider both of the statutory issues with the degree of impartiality to which the State was entitled. A prospective juror is properly excused under *Witherspoon* if he would answer at least one of the punishment issues "no" to avoid the imposition of the death penalty. *Kelly*, supra; *Woolls*, supra; *Griffin v. State*, 665 S.W.2d 762 (Tex.Cr.App.1983), cert. denied, — U.S. —, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984).

Appellant's second ground of error is overruled.

In his third and final ground of error, appellant contends that Art. 37.071, V.A.C.C.P., allows the jury unfettered discretion in assessing the death penalty and is discriminatory in its application in violation of the strictures of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Appellant acknowledges that Art. 37.071 is neutral on its face, but argues that it is an "unconstitutional denial of due process as applied in that it allows the jury an impermissible range of discretion in sentencing in a capital case."

▮▮▮▮ *Furman*, however, did not stand for the proposition that a jury is not permitted to exercise discretion in assessing the death penalty, but

"only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose [the death penalty] had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S.Ct. 2909 [2937], 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

Accordingly, the Supreme Court examined the Texas death penalty statute in light of the strictures of *Furman* and decided contrary to appellant's contention. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). See also *Brock v. State*, 556 S.W.2d 309 (Tex.Cr.App.), cert. denied, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977); *Brown v. State*, 554 S.W.2d 677 (Tex.Cr.App.1977); *Gholson v. State*, 542 S.W.2d 395 (Tex.Cr.App.1976), cert. denied, 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977); *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr.App.1975), aff'd., *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). We decline to reconsider the *Jurek v. Texas*, supra, decision.

Appellant's third ground of error is overruled.

The judgment of the trial court is affirmed.

CLINTON, J., concurs.

TEAGUE, Judge, dissenting.

Having concluded that today should be the day for this Court to finally give meaning to the provisions of Art. 15.17, V.A.C.C.P., that the person making an arrest of the accused shall without unnecessary delay take the accused or have him taken before some magistrate of the county where he was arrested, I would first apply to this cause the same principles that Justice Frankfurter stated in the unanimous opinions he authored for the Supreme Court in *Mc Nabb v. United States*, 318

434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294

(1977).

U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), and would then reverse appellant's conviction for failure of the police to comply with the above statute. The majority, however, opts to continue on its merry way. To the majority's continued subscription to a rule of law that does not comport with "civilized standards of procedure and evidence," *Mc Nabb v. United States*, 318 U.S. at 340, 63 S.Ct. at 613, 87 L.Ed. at 824, I dissent.