# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-00-00575-CR

**Christopher Sullivan, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
## NO. 994342, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING

Appellant Christopher Sullivan was charged by indictment with indecency with a child by contact, enhanced by two prior convictions to a first degree felony. *See* Tex. Penal Code Ann. §§ 12.42(b), 21.11(a)(1), (c) (West Supp. 2001). Appellant waived a jury trial, and after a bench trial, the district court found appellant guilty of the charge. He was sentenced to ten years' confinement. Appellant appeals his conviction, arguing the evidence was legally and factually insufficient to support the conviction. We will affirm.

### Standard of Review

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and ask whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Rojas v. State*, 986 S.W.2d 241, 246-47 (Tex. Crim. App. 1998); *Reina v. State*, 940 S.W.2d 770, 772 (Tex. App.—Austin 1997, pet. ref'd). In reviewing the

factual sufficiency of the evidence, we view all of the evidence objectively and set aside a verdict only if it is so against the overwhelming weight of the evidence as to be clearly wrong and unjust. *Rojas*, 986 S.W.2d at 247; *Reina*, 940 S.W.2d at 773. The trier of fact is the sole judge of the credibility of witnesses and may believe or disbelieve all or any portion of a witness's testimony. *Williams v. State*, 692 S.W.2d 671, 676 (Tex. Crim. App. 1984); *Skillern v. State*, 890 S.W.2d 849, 879 (Tex. App.—Austin 1994, pet. ref'd).

**Facts**

The victim was ten-years old at the time of the offense and lived with her parents, brother, grandmother, aunt, uncle, and cousin. Appellant was a close friend of the aunt and uncle and had spent the night at the house many times before the incident. The victim testified that one day in May 1999, she stayed home sick from school. She was lying on her bed, wearing shorts, a tee-shirt, underwear, and a bra, listening to music when appellant came into the room, shut the door, and placed a large container in front of the door. Appellant told the victim to be quiet and turned her over on her back. The victim said she was scared and thought appellant might hurt her.

The victim testified that appellant used his hands to touch her breasts, both on top of and under her clothes. She said he put his hand under her bra and then touched her "lower part" on "[t]he private." When asked which part of the body she was referring to, the victim said "it's hard to describe," and used an anatomically correct doll to show the court where appellant had touched her. The prosecutor said, "And just for the record, Your Honor, she's indicating the doll's vagina." The victim said he touched her "private" on top of her clothes and then underneath. She said he moved his hand around and then "got his finger and tried to stick it up there," in the "private part on

2

the bottom." Appellant again told her to keep quiet. The victim said it hurt her badly and she "passed out because [she] was so scared." She said, "I was like kind of hoping it wasn't happening to me and then I kind of fainted." She testified that appellant removed her clothing, "somehow got [her two-piece] bathing suit on [her]," and then took off the bottom part of her suit. The victim said, "He kept several times trying to get my hand and put it down there on his private part, but I kept moving it." The victim said appellant's "private part" felt hard.

The victim testified that while appellant was on top of her, her mother opened the door and yelled at appellant. The victim found her swimsuit bottom, put it on, and ran to her father. Her father talked to appellant and went to find her aunt and uncle; the victim stayed with her mother and told her what had happened. That night, the victim's father called the police.

On cross-examination, the victim was asked about inconsistencies between her trial testimony and other statements she had given in the past and between her trial testimony and how she described the events to her mother. The victim admitted that before trial she had never told anyone that appellant tried to put his finger in her vagina or that she had passed out. She also had never told anyone that she had touched his penis. Appellant then sought to ask about the victim's mother's drug use because

> it's a very large part of the case. The mother and [appellant], at least the two of them, the night before were doing a lot of drugs. The mother was angry at him . . . . Mother is doing drugs. Daughter is neglected, shut out literally, physically as well as emotionally. And this is an event which really charged everybody up and brought . . . Mom and daughter together. Also, Mama was mad . . . had an argument with him that night and said she was going to get him. And this is what happened.

3

The child admitted that her mother had "used [drugs] a couple of times." She denied that her mother locked her out when she was using drugs, but admitted that her mother would shut the door. She said she loves her mother and her mother always takes care of her.

The victim said she did not remember telling anyone that she did not think the police had believed her story or that someone else had molested her earlier. On re-direct, the victim said she did not want to testify because, "My [aunt] told me that if we just drop the cases, my mom won't go to jail and nothing will happen." The victim said her aunt did not believe her accusations and no longer spoke to her. When asked if appellant had ever touched her before the incident, the victim said, "He tried a couple of times, but no. . . . [W]hen I passed by him, like he would rub my hand or try to pull me. I would like slip away or something." Before this incident, the victim's grandmother worried about appellant's behavior and talked to the victim's father, who told appellant to stay away from the victim.

The victim's mother, Rebecca, testified that on the day of the offense, appellant was at their house, where he had stayed off and on "[s]ince he got out of prison." Her daughter stayed home sick from school and went to her room to listen to the radio. Rebecca changed clothes to do some yard work, but "came back and had a bad feeling that something was wrong." She said:

> I had to go in there. It's just – you have a gut feeling that something is wrong. You have to go check on your daughter. Like if you've got – you're going to get sick to your stomach and you're going to vomit. I had a bad feeling that something was wrong. Something was not right.
>
> I went to go check on my daughter. The door was closed all the way. I tried to push it open, but I couldn't push it open. I had to push it real hard to open it, like I had to bust the door down. When I did, I walked in. She was laying on the bed.

4

[Appellant] was there beside her. He looked up, and I was shocked. I just like couldn't speak or nothing. I was just in total shock. The first thing he said – "I didn't do anything. We didn't do nothing. Nothing happened. Nothing happened." Didn't say a word. I was just standing there at the door shocked. Couldn't speak. Couldn't say anything.

Soon as I did, I told her, put a towel on, put something on, and to go to my room.

Rebecca said when she entered the room, the victim was lying on her back, wearing only the top part of her bathing suit, and appellant was lying on top of her. When she entered, appellant "jumped up real fast." Afterwards, the victim was "scared, trembling, nervous. She wanted to cry, but she was just in shock. . . . She just couldn't look at anybody." The victim talked a little about what had happened, but started to cry, and her mother did not want to force her to talk. When asked what the victim told Rebecca about this incident, Rebecca said, "She told me – she goes – she said, 'Mom, you know how when you go to the restroom and sometimes you burn a lot? It's like that,' but she said it was a lot worse like if you were on fire." Throughout the day, the victim slowly told Rebecca what had happened, and later that night, Rebecca called the police. The victim told her mother that appellant had touched her "private part" under her clothes.

Rebecca testified that Rachel, the victim's aunt, did not believe the allegations and threatened to "have [Rebecca] taken out." Rebecca also testified that before the offense, she overheard appellant say that the victim "has got a body on her."

On cross-examination, Rebecca said when she tried to open the door, it felt like "something was blocking the door." She said when she entered the room, appellant's shorts were off, but she admitted that she had never before told anyone that appellant was not wearing his shorts. However, later in her testimony she said she had told a detective. The victim told Rebecca that

5

appellant gave her the bathing suit and told her to go to the bathroom and put it on. The victim said that she put the suit on and went back to the bedroom and then took off her bathing suit bottom because appellant told her to. Rebecca said that right after the incident, the victim spoke to her aunt.

Rebecca admitted to shooting cocaine with appellant the night before the offense. Rebecca denied that her daughter developed crushes on men and boys easily, and said the victim was "buddies" with a man the victim had testified she did not know. She also denied that the victim had falsely accused other people of molesting her and denied threatening the victim's aunt.

Elmo, the victim's father, testified that he had been good friends with appellant. He said he was asleep when he woke to his wife's screaming. Rebecca told Elmo that appellant had been in the bedroom with the victim, and Elmo went to speak to appellant, who "just said he didn't do it." Appellant then tried to hug Elmo and was trembling. Elmo talked to Rebecca and he said he initially did not believe her. Asked whether he first thought Rebecca might have made it up, he said, "That's a tough one. . . . Because – yes, ma'am, that was a possibility that she was making this up." He said he was "reluctant" to talk to the victim about it, that he wanted to talk to the adults to try to straighten out what had happened and to calm things down. Later that day, appellant gave Elmo a ride and told Elmo he did not want to go back to prison and he would get his gang to go after Rebecca if he thought he might go back to prison. Elmo interpreted that remark as a threat.

Elmo said that before the incident, appellant was found in the victim's room with the door not closed all the way and as "a precautionary statement," he told appellant that "it would be better not to go in there, that we would be paying attention if he was in there again." Elmo said he did not think his daughter was lying. He said, "I believe my daughter, what she told me – or after

6

things had – turn of events that happened, I started believing what had happened. But then what makes it for me hard to believe is also I'd had a problem [believing my] wife."

Rachel, the victim's aunt, testified for appellant. She said that after the incident, she talked to the victim, who "had like a smirk, a half smile on her face" and said her mother told her to say appellant touched her. About a half-hour later, Rachel saw Rebecca and the victim making a cake, "laughing and just happy." Rachel said when she returned later that night to police cars at the house, Elmo apologized that he could not stop Rebecca from calling the police. Rachel said that Rebecca is a drug addict who locks herself away from the victim when she is using drugs. She said the victim is "sort of neglected" when Rebecca is using or coming off of drugs. She said Rebecca and the victim were vindictive and were liars. Rachel said Rebecca had recently left Rachel a voice mail message saying, "You're going to die, bitch." Rachel denied threatening Rebecca. She said she and appellant are best friends, but denied that they had a sexual or romantic relationship.

Two of the victim's cousins also testified that they did not think the victim was a truthful person. Rachel's daughter said that the victim will say "pretty much what her mom wants her to say" and that Rebecca's drug use makes the victim feel depressed and unwanted. Rachel's husband testified that Rebecca is untruthful and vindictive.

Appellant also introduced a videotape of the victim's interview at the Child Advocacy Center. In the tape, the victim said that appellant came into her room, shut the door, and started to touch her. She said he rubbed his hands over her and put her bathing suit on her. She said he held her down with his knees and used his hands to put the suit on her. She said he laid her down on her back and touched her on the outside of her vagina and her breasts. She said he did "not really" touch

7

her where "the pee comes out," but touched everything else around that. She said appellant told her to touch him but she refused.

### Discussion

Appellant's argument on appeal is that the victim and her mother were both impeached at trial and, therefore, their testimony should be disregarded. While there were inconsistencies in the victim's recounting of the incident, the fact-finder is the ultimate judge of the credibility of the witnesses and the weight to be given their testimony.

Confusion over whether appellant's pants were on when Rebecca entered the room, and how exactly he held the victim down as he took her clothes off are not controlling factors in the testimony. The fact that her trial testimony was the first time she had said he attempted to put his finger in her vagina and that he put her hand against his penis does not render her testimony unreliable as a matter of law. The victim testified consistently that appellant entered her room, closed and blocked the door, removed her clothing, and touched her breasts and vagina with his hands. Rebecca's testimony that she had to shove the door open and saw appellant on top of or next to the half-naked victim on her bed conforms with the victim's testimony. If the district court believed the victim, her testimony establishes beyond a reasonable doubt the only disputed element of the offense, that he engaged in sexual conduct with the victim, and such a verdict would not be manifestly wrong and unjust. *See* Tex. Penal Code Ann. § 21.11(a)(1); *Rojas*, 986 S.W.2d at 246-47.

The district court had before it all of the testimony and the victim's videotaped statement at the Child Advocacy Center. It also had before it extensive testimony attacking the victim's and Rebecca's truthfulness and describing Rebecca's drug use and possible manipulation of

8

the victim. The appellant thoroughly pointed out at trial the various inconsistencies and omissions on which he relies on appeal. The district court, as the finder of fact, was entrusted with the responsibility of evaluating the credibility and demeanor of all the witnesses. *See Williams*, 692 S.W.2d at 676; *Skillern*, 890 S.W.2d at 879. Having found appellant guilty, the district court necessarily found the victim's testimony credible on the issue of whether appellant did in fact engage in sexual contact with her. We will not second-guess that determination of witness credibility. The evidence is both legally and factually sufficient to support the conviction. We overrule appellant's issues on appeal and affirm the district court's judgment.

_____

Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Puryear

Affirmed

Filed: July 26, 2001

Do Not Publish

9