

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00217-CR

———————————————

MARK ANTHONY RODRIGUEZ, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 432nd District Court
Tarrant County, Texas
Trial Court No. 1808530

---

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

Appellant Mark Anthony Rodriguez challenges his conviction for indecency with a child. According to the complainant—Rodriguez's cohabitating girlfriend's then-10-year-old daughter, A.R. (Amy)[1]—she awoke around 2:00 a.m. to find Rodriguez touching her genitals. But according to Rodriguez, he merely moved Amy's leg to retrieve the television remote from underneath her. The jury believed Amy and found Rodriguez guilty of indecency with a child by sexual contact. *See* Tex. Penal Code § 21.11(a)(1), (c)(1).

Rodriguez argues that (1) the jury's verdict was not supported by the evidence because Amy's allegations "def[ied] common sense" while his innocent explanations "ma[de] entirely more sense"; and (2) the trial court "overstepped" by intervening when Rodriguez's counsel asked a misleading question, by commenting on that question, and by "blackmailing" his counsel into abandoning the question.[2] But (1) it was the jury's prerogative to believe Amy's testimony over Rodriguez's; and (2) the trial court was within its discretion to intervene, its comments were made outside the jury's presence, and its explanation of the legal consequences of Rodriguez's

---

[1]To protect the complainant's privacy, we refer to her using a pseudonym, and we refer to her family members using labels. *Cf.* Tex. R. App. P. 9.10(a)(3).

[2]Rodriguez's issues have been reordered for organizational purposes and to reflect the magnitude of potential relief. *See Solis v. State*, 726 S.W.3d 394, 403 n.5 (Tex. Crim. App. 2025) (reordering issues to begin with issue that would provide greatest relief).

misleading question did not amount to "judicial blackmail." Thus, although we will modify the judgment to accurately reflect Rodriguez's sentence, we will otherwise affirm.

## I. Background

Rodriguez was indicted for indecency with a child by "touching . . . the genitals of [Amy]."[3] *See id.* At trial, (1) the jury heard evidence of Amy's and Rodriguez's conflicting accounts of what happened, and (2) as relevant to this appeal, the trial court expressed concern regarding a misleading question.

### A. Conflicting Evidence

Amy[4] told the jury that around 2:00 a.m. one night, Rodiguez came into her bedroom, and using the flashlight on his phone to see, he "touch[ed her] vagina." Mother was asleep when the incident occurred, and Amy recalled going into Mother's room to tell her, but because Rodriguez followed Amy into the room, she "was [too] scared" to say anything. Instead, Amy returned to her room and called her great-grandmother (Great-Grandmother).

Great-Grandmother confirmed that Amy had called her early that morning, and she told the jury that she "immediately knew something was not right." She described Amy's uncharacteristically quiet demeanor on the phone, and she recalled

---

[3]Rodriguez was also indicted for aggravated sexual assault of a child, but the jury found him not guilty of that charge.

[4]Amy was 11 years old at the time of trial.

Amy's telling her what Rodriguez had done. Great-Grandmother stayed on the phone with Amy until Mother entered Amy's room to wake her up for school the following morning after Rodriguez had gone to work.

According to Mother, when she went into Amy's room, Amy was already awake, she was hiding in the closet, she was on the phone with Great-Grandmother, and she looked like she had been crying. Mother recalled that at that point, Amy told her that Rodriguez had "touched [her] down there in [her] no-no part," gesturing between her legs.[5]

Rodriguez, however, flatly denied that his "fingers ever touch[ed] any part of [Amy's] genitals." Testifying in his own defense, Rodriguez told the jury that on the night in question, he had been playing Fortnite on his computer at the dining room table, and his adult son Isaiah[6] had been playing the game remotely while also Facetiming with him. Around 2:00 a.m., Rodriguez and Isaiah agreed to play one last game of Fortnite, and Rodriguez began turning off the lights and other electronics in the apartment while the final game loaded. Rodriguez told the jury that he had seen the television remote on Amy's bed earlier in the evening, so he "went into [her]

---

[5]Amy underwent a sexual assault examination, but the nurse did not find any signs of injury.

[6]Rodriguez had five children—two sons and three daughters. At the time of trial, his children ranged in age from approximately 7 to 23.

room, moved her leg over,[7] grabbed the remote [from underneath her], and came back," taking about "[t]hirty seconds."[8] He explained that he had used his phone as a flashlight when he went into Amy's room, with Isaiah on Facetime the entire time.

Isaiah confirmed that on the night in question, he and Rodriguez had played Fortnite from around 8:00 p.m. to 2:30 a.m. and had Facetimed as they played. He further confirmed that while the final game was loading, Rodriguez got up to turn off the television. But Isaiah gave mixed testimony as to whether Rodriguez took his phone with him when he went to retrieve the remote. He initially told the jury that Rodriguez had not taken his phone but later testified that Rodriguez had taken his phone but that it had been too dark for Isaiah to see anything.[9] Either way, Isaiah confirmed that within about 30 seconds, Rodriguez returned to the computer, and they continued playing Fortnite.

Rodriguez thus insisted that Amy had fabricated her allegation of touching.[10] In keeping with this defensive theory, he attempted to show how the idea of sexual

---

[7]Rodriguez told the jury that Amy's knees were leaning towards the wall and the remote was underneath her.

[8]Rodriguez explained that Fortnite provided a one-minute break between games and that he had gone into Amy's room to get the remote during that time.

[9]When the State highlighted this conflict on cross-examination, Isaiah repeated it.

[10]Rodriguez testified that before the touching incident, he had a good relationship with Amy, he had recently thrown her a birthday party, and she had seen him as a father figure.

contact may have been planted in her head,[11] and he emphasized that she had disclosed the alleged touching to numerous adults, implying that such conversations had influenced her. One such attempt involved Amy's forensic interviewer and led to the trial court exchange that Rodriguez challenges on appeal.

## B. Exchange Regarding Misleading Question

Rodriguez sought to portray forensic interviewers as "partner[s] with law enforcement" who asked "questions in different ways until the interviewer[s] g[ot] the result[s] that they want[ed]." So when the State called a forensic interviewer to testify about the process,[12] Rodriguez asked, "[I]sn't it true that on other occasions . . . [Amy's forensic interviewer] ha[d] questioned a child until she got the response she wanted and the alleged perpetrator was later exonerated?" The State immediately objected to the question as irrelevant, and at the bench—outside the jury's earshot—the trial court questioned the truth of Rodriguez's allegation. When Rodriguez's counsel insisted that the allegation was true, the trial court dismissed the jury.

---

[11]Rodriguez highlighted that not long before the incident, Mother had chastised Amy for "slapping [Mother] and others on the butt" and had "talk[ed] to [Amy] about good touch/ bad touch," including "[a]bout how men should not touch [her] on [her] private parts."

[12]The individual who had forensically interviewed Amy was not available for trial, so another interviewer testified. The interviewer explained how forensic interviews were conducted and what they sought to accomplish.

6

Outside the jury's presence, Rodriguez's counsel clarified that Amy's forensic interviewer had been involved in a prior case in which the alleged abuser had been no-billed by a grand jury. The trial court distinguished between a no-bill and an exoneration, and it expressed concern that Rodriguez's question "left a false impression on the jury in the form of [the] question that a man that was falsely accused was later proved innocent." Rodriguez's counsel volunteered to rephrase his question, and the trial court indicated that it would allow him to do so but would also order him to "retract [the question] and . . . apologize to the State," as the false impression was "very distasteful."

The matter did not end there, though. The State took the opportunity to offer the video recording of Amy's forensic interview into evidence, arguing that the video was necessary to correct Rodriguez's false impression by allowing the jurors to "decide for themselves" whether Amy's forensic interviewer had influenced her. Rodriguez's counsel protested by, among other things, insisting that his reference to "exoneration" had not technically been misleading after all.[13] The trial court concluded that Rodriguez had "two options": (1) to "leave the question posed" and

---

[13]Rodriguez's counsel quoted one of *Black's Law Dictionary*'s definitions of "exoneration," and he asserted that, in the previous case involving Amy's forensic interviewer, "[a] Grand Jury [had] no-billed [the alleged perpetrator, t]he allegations [had] later [been] withdrawn by the victim, and a family court [had] entered an order agreed to by the other parent that it was in the child's best interest to continue living with the alleged perpetrator." The trial court, however, quoted a different definition of "exonerate" from *Black's Law Dictionary* to explain its conclusion that the word did not apply.

"persist in [claiming] that [the previous case] . . . constitute[d] an exoneration," knowing that "the [forensic interview] video [c]ould be played so the[ jury] c[ould] make a factual determination themselves," or (2) to withdraw the question, clarify the meaning of exoneration, apologize, and move on. Rodriguez's counsel opted for the latter course.[14] Thus, when the jury returned, Rodriguez's counsel stated,

> Your Honor, at this time I will withdraw my previous question. The word "exoneration" is a term of art that I should not have used. It is a term of art that is very specific and technical in the law. I apologize for wasting your time.

And with that, the trial proceeded.

## C.     Verdict, Sentencing, and Judgment

Ultimately, the jury found that Rodriguez had "intentionally, with the intent to arouse or gratify the sexual desire of any person, engage[d] in sexual contact by touching . . . the genitals of [Amy]." And after hearing additional punishment evidence, it assessed Rodriguez's punishment at 5 years' confinement with no fine. The trial court orally pronounced Rodriguez's sentence accordingly.

But, later, when the trial court entered a written judgment memorializing Rodriguez's conviction and sentence, the court added a $100 statutory fine that had not been orally pronounced. *See* Tex. Code Crim. Proc. art. 102.0186.

---

[14]The trial court clarified that by withdrawing his question, Rodriguez's counsel was "waiving everything that [he had] previously argued." Rodriguez acknowledged as much and proceeded to withdraw his question.

8

## II. Discussion

On appeal, Rodriguez challenges (1) the sufficiency of the evidence to support his conviction, and (2) the trial court's handling of his misleading question. We add to these a third issue: (3) the judgment's erroneous memorialization of Rodriguez's sentence.

### A.     Challenge to Evidentiary Sufficiency

First, Rodriguez asserts that the evidence was insufficient to support his conviction for indecency with a child because no rational jury could have found that he touched Amy's genitals. Rodriguez argues that Amy's "factual allegations . . . defy common sense" because "[t]o believe [her,] one would have to conclude that [he] decided to sexually abuse [her] . . . in between playing combat video games and while his son was on the phone." He insists that his own "explanation of events . . . makes entirely more sense."

But Rodriguez's appeal to "common sense" is a red herring. The fact that indecency with a child is statutorily criminalized in Texas reflects that such conduct defies societal notions of acceptable, "common sense" behavior. *Cf. Ruffin v. State*, 270 S.W.3d 586, 592–93 & n.17 (Tex. Crim. App. 2008) (discussing insanity defense and explaining that the test is whether "the defendant factually know[s] that society considers []his conduct against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified"); *Tovar v. State*, 978 S.W.2d 584, 587 & n.5 (Tex. Crim. App. 1998) (distinguishing between an offense that

9

is *malum prohibitum* versus one that is *malum in se* and noting that, in the latter instance, the act is "immoral in its nature" even without being legally noticed as such); *Woodall v. State*, 77 S.W.3d 388, 394–95 (Tex. App.—Fort Worth 2002, pet. ref'd) (reaffirming that because indecent exposure involves the "intent to sexually arouse either himself or another," the defendant "acts upon motives of baseness, vileness, and depravity, and . . . the offense . . . [is] a crime of moral turpitude"). Thus, Rodriguez's argument, at its core, is simply a challenge to the jury's credibility assessment, i.e., a challenge to the jury's decision to believe that he engaged in the abnormal behavior alleged.

And although we may overturn a jury's verdict when it lacks evidentiary support, we may not "re-weigh the evidence or substitute our judgment for that of the [jury]." *Zuniga v. State*, 551 S.W.3d 729, 732–33 (Tex. Crim. App. 2018); *see Fernandez v. State*, No. 02-25-00158-CR, 2026 WL 406044, at *3 (Tex. App.—Fort Worth Feb. 12, 2026, pet. filed) (mem. op., not designated for publication). "[T]he jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony." *Zuniga*, 551 S.W.3d at 732–33; *see Witcher v. State*, 638 S.W.3d 707, 710 (Tex. Crim. App. 2022); *Fernandez*, 2026 WL 406044, at *3. Even if we would have weighed the evidence differently, as "a reviewing court[, we] do[] not sit as the thirteenth juror." *Garcia v. State*, 667 S.W.3d 756, 758, 762–66 (Tex. Crim. App. 2023) (holding court of appeals "improperly acted as a thirteenth juror" in its sufficiency review and "erred by focusing on the weaknesses in the State's case"); *Slagle v. State*, No. 02-14-00335-CR, 2015 WL 4692422, at *5 (Tex. App.—Fort Worth

10

Aug. 6, 2015, pet. ref'd) (mem. op., not designated for publication) (recognizing that an "[a]ppellate court[] cannot 'sit as a thirteenth juror'" and must yield to the jury's "reconciliation of conflicts and contradictions in the evidence"). Our sufficiency review is narrow in this sense; it considers only whether a rational jury could have found the challenged essential element—here, sexual contact by touching a child's genitals—beyond a reasonable doubt. *Witcher*, 638 S.W.3d at 709–10; *Zuniga*, 551 S.W.3d at 732–33; *Fernandez*, 2026 WL 406044, at *3; *see* Tex. Penal Code § 21.11(a)(1) (defining offense of indecency with a child), (c)(1) (defining "sexual contact"). And in conducting that narrow review, we view the evidence in the light most favorable to the verdict, we "presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution." *Zuniga*, 551 S.W.3d at 732–33; *see Witcher*, 638 S.W.3d at 709–10; *Fernandez*, 2026 WL 406044, at *3.

Here, Amy testified that Rodriguez "touch[ed her] vagina inappropriately," and the jury was entitled to "believe or disbelieve all or any part of [her] testimony." *Dusenbery v. State*, No. 02-16-00125-CR, 2018 WL 4025078, at *7 (Tex. App.—Fort Worth Aug. 23, 2018, pets. ref'd, struck, & dism'd, untimely filed) (mem. op., not designated for publication) (quoting *Williams v. State*, 692 S.W.2d 671, 676 (Tex. Crim. App. 1984)). Such testimony—standing alone—was sufficient to support Rodriguez's conviction. *See* Tex. Code Crim. Proc. art. 38.07 (providing that "[a] conviction under Chapter 21 . . . is supportable on the uncorroborated testimony of the victim" when

11

"at the time of the alleged offense[,] the victim was . . . 17 years of age or younger"); *Fernandez*, 2026 WL 406044, at *3 (reviewing sufficiency of the evidence to support indecency conviction and reiterating that "a child victim's testimony, standing alone, can sufficiently support a conviction for indecency with a child"); *Dusenbery*, 2018 WL 4025078, at *3 (reviewing sufficiency of the evidence to support conviction for continuous sexual abuse involving instances of indecency with a child and recognizing that "[a] complainant's uncorroborated testimony of sexual abuse suffered as a child, standing alone, can support a conviction"); *Slagle*, 2015 WL 4692422, at *4–5 (reviewing sufficiency of the evidence to support aggravated sexual assault and indecency with a child by contact convictions; recognizing that "[t]he testimony of a child sexual abuse victim, standing alone, is sufficient to support [the] conviction[s]"; and reiterating that an appellate court cannot "sit as a thirteenth juror").

Yet, Amy's testimony did not stand alone. In addition,

- Great-Grandmother told the jury how Amy had called her on the morning of the incident and how she "immediately knew something was not right"—both because of the time of day and because Amy was not her usual, "very cheery" self on the phone.

- Mother testified that, when she went into Amy's room to wake her up on the morning after the incident, Amy was already awake, she was hiding in the closet, she was on the phone with Great-Grandmother, and she looked like she had been crying.

12

- Mother recalled how Amy "slept with [her] for a few months" after the incident and "didn't want to sleep in her room" alone.[15]

Taking all of this evidence together, a rational jury could have believed Amy and found beyond a reasonable doubt that Rodriguez touched her genitals, even though such touching defied societal notions of "common sense" behavior. The evidence was sufficient to support Rodriguez's conviction, and we overrule his first issue.

## B. Challenge to Trial Court's Handling of Misleading Question

Rodriguez's second challenge to his conviction focuses on the trial court's handling of his misleading question regarding "exonerat[ion]." He asserts that the trial court "overstepped [its] bounds" by "injecting objections not raised by the [S]tate"; it "judicial[ly] blackmail[ed]" his counsel by "predicating . . . the admissibility of evidence upon whether counsel followed [the court's] commands"; and it improperly commented on the weight of the evidence and "attack[ed his] counsel." According to Rodriguez, these actions violated Article 38.05 of the Code of Criminal Procedure and reflected an "abandon[ment of the trial court's] role as an independent arbiter," depriving him of a fair trial and the effective representation of counsel.[16]  *See*

---

[15]After the incident, Mother and Amy stayed with Great-Grandmother temporarily, and Rodriguez moved out of the apartment.

[16]Rodriguez does not explain how the trial court's allegedly improper comments rendered his trial counsel's performance "deficient" such that an objectively reasonable attorney would have acted differently. *See Prine v. State*, 537 S.W.3d 113, 116–17 (Tex. Crim. App. 2017) ("To prevail on a claim of ineffective

U.S. Const. amends. V–VI; Tex. Const. art. 1, §§ 10, 19; Tex. Code Crim. Proc. art. 38.05.

But while Rodriguez throws out quite a number of allegations, one allegation is noticeably absent: He does not dispute that his exoneration-related question was, in fact, misleading.[17] And "[i]t is not improper for a trial judge to interject in order to correct a misstatement or misrepresentation." *Jasper v. State*, 61 S.W.3d 413, 420–21 (Tex. Crim. App. 2001) (holding trial court did not err—much less deprive the defendant of a fair and impartial trial—by intervening to prevent misleading line of questioning and to correct misstatement of testimony). Rather, a trial court has the

---

assistance of counsel, the defendant must show that counsel's performance was deficient . . . [meaning that] it falls below an objective standard of reasonableness."); *see also Strickland v. Washington*, 466 U.S. 668, 687–91, 104 S. Ct. 2052, 2064–66 (1984); *cf.* Tex. R. App. P. 38.1(i) (requiring an appellant's brief to provide "a clear and concise argument for the contentions made, with appropriate citations to authorities"). Nor does Rodriguez distinguish between his rights under the Texas Constitution and those under the United States Constitution. *Cf. Shuffield v. State*, 189 S.W.3d 782, 788 (Tex. Crim. App. 2006) (concluding that "[b]ecause the appellant provide[d] argument and authority under only the United States Constitution, he . . . forfeited consideration of the[] points of error under the Texas Constitution"). Regardless, we attempt to address his allegations.

[17]In his appellate brief, Rodriguez quotes his trial counsel's arguments, including his counsel's reference to *Black's Law Dictionary*. But Rodriguez does not acknowledge the trial court's subsequent clarification of its reasoning based on a different *Black's Law Dictionary* definition of "exonerate." Nor does he contend that the trial court abused its discretion by rejecting his counsel's arguments on the merits and treating the "exoneration" question as misleading. Instead, Rodriguez focuses his appellate complaints on the trial court's tone, i.e., the trial court's alleged "attack[s on his] counsel."

reasonable discretion to control the examination of witnesses "so as to . . . make those procedures effective for determining the truth." Tex. R. Evid. 611(a)(1).

Moreover, although Rodriguez argues that his decision to withdraw his misleading question was the result of "judicial blackmail"—i.e., the trial court's "predicating [its] determination of the admissibility of evidence" upon counsel's willingness to "capitulat[e]" by withdrawing the question—a trial court does not "blackmail" a party by enunciating the potential legal consequences of the party's actions. *See Strong v. State*, 138 S.W.3d 546, 552–53 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.) (rejecting argument that trial court's explanation of evidentiary consequences violated Article 38.05 and due process and noting that the trial court "can make comments regarding whether or not testimony [will] be allowed"); *cf.* Tex. Code Crim. Proc. art. 38.05 (prohibiting a trial court from "discuss[ing] or comment[ing] upon the weight of the [evidence] or its bearing in the case").

Generally, "[e]vidence that is otherwise inadmissible may become admissible when a party opens the door to such evidence . . . by leaving a false impression with the jury that invites the other side to respond." *Hayden v. State*, 296 S.W.3d 549, 554–55 (Tex. Crim. App. 2009) (recognizing rule but holding that it did not require trial court to admit defendant's evidence that victim was a sex offender in response to State's evidence that victim was "a nice guy"); *see Clement v. State*, 499 S.W.3d 153, 159 (Tex. App.—Fort Worth 2016, pet. ref'd) (recognizing and applying rule). And, again,

15

Rodriguez does not dispute that his exoneration-related question created a false impression. Thus, the trial court merely reminded Rodriguez of the evidentiary consequences of his misleading question when it explained that if he pursued the question, the State would be permitted to present responsive evidence—specifically, the video recording of Amy's forensic interview—to correct the false impression. *See Clement*, 499 S.W.3d at 159–60 (holding that because defendant's questioning created the false impression that anyone with a physical ailment would be unable to perform field sobriety tests, the trial court was within its discretion to allow the State to "clear[] up the false impression by eliciting [the police officer's] testimony regarding his [own] physical ailments, which did not hinder his performance of abbreviated versions of the field-sobriety tests"). The if–then nature of this evidentiary consequence was not of the trial court's making, nor did it constitute "judicial blackmail." *See Strong*, 138 S.W.3d at 552–53 (holding trial court's explanation of alternative evidentiary consequences of defendant's alternative actions did not amount to "assist[ing] the State" or "abandon[ing its] role as an independent arbiter").

As for the trial court's allegedly biased comments and "attack[s]" on Rodriguez's counsel, none of those could have caused Rodriguez harm anyway. "To constitute reversible error, the trial court's comment[s] to the jury must be such that [they are] reasonably calculated to benefit the State or to prejudice the rights of the defendant." *Becknell v. State*, 720 S.W.2d 526, 531–32 (Tex. Crim. App. [Panel Op.] 1986) (holding that trial court's comments during bench conference were harmless);

16

*see Jasper*, 61 S.W.3d at 420–21 (rejecting argument that trial court's comments deprived defendant of fair trial when such comments did not "r[i]se to such a level as to bear on the presumption of innocence or [to] vitiate the impartiality of the jury"); *Strong*, 138 S.W.3d at 552–53 (quoting standard and rejecting defendant's argument that trial court's comments violated due process or Article 38.05); *see also* Tex. R. App. P. 44.2(a) (providing that even when an alleged error is constitutional in nature, reversal is not warranted if "the [appellate] court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment"). And here, all of the trial court's challenged comments and so-called "attack[s]" occurred outside the jury's presence. *Cf.* Tex. Code Crim. Proc. art. 38.05 (prohibiting a trial court from making any remark calculated to convey its opinion of the case "to the jury"). From the jury's perspective, Rodriguez asked a question, the State objected, the trial court took up an unspecified matter outside the jury's presence, and Rodriguez's counsel subsequently "withdr[e]w [his] previous question," clarified that "[t]he word 'exoneration' [wa]s a term of art," "apologize[d]," and moved on. Any "[d]iscussion or commentary that occur[red] outside the jury's presence or hearing neither benefit[ted] the State nor prejudice[d] the defendant's rights and therefore cannot constitute reversible error."[18] *Costilla v. State*, 650 S.W.3d 201, 219 (Tex. App.—

---

[18]Plus, to the extent that the jury might have detected the trial court's irritation with Rodriguez's misleading question, "a trial judge's irritation at the defense attorney does not translate to an indication as to the judge's views about the defendant's guilt or innocence." *Jasper*, 61 S.W.3d at 420–21 (rejecting argument that trial court's

17

Houston [1st Dist.] 2021, no pet.); *see Becknell*, 720 S.W.2d at 531–32 (holding that trial court's comments during bench conference were harmless); *Strong*, 138 S.W.3d at 553 (holding that because the trial court's "comments about the admissibility of the State's rebuttal witness were made outside the presence of the jury," the comments could not have influenced the jury).

All in all, none of Rodriguez's challenges to the trial court's handling of his misleading question constitute reversible error. We overrule his final issue.

## C.      Correction of Judgment's Memorialization of Sentence

Although neither of Rodriguez's appellate issues identify a reversible error, the record reveals an error that—while not warranting reversal—requires modification. Rodriguez's judgment of conviction reflects a $100 statutory fine that was not orally pronounced as part of his sentence.[19]  *Cf. Munoz*, 2026 WL 71063, at *9 (explaining that "a fine is part of a defendant's sentence and must be orally pronounced" and that when the written judgment differs from the oral pronouncement, the latter controls); *Baker*, 2025 WL 1240160, at *7 (similar).  And even when a party does not complain

---

comments deprived the defendant of a fair trial when the court intervened to correct a misleading line of questioning and told the defense counsel to "[k]nock it off").

[19]The $100 fine is labeled, "Child Abuse Prevention Fine (Art. 102.0186 Code Crim. Proc.)." *See* Tex. Code Crim. Proc. art. 102.0186; *Munoz v. State*, No. 02-25-00032-CR, 2026 WL 71063, at *9 (Tex. App.—Fort Worth Jan. 8, 2026, no pet.) (mem. op., not designated for publication) (noting similar unpronounced fine); *Baker v. State*, No. 11-23-00073-CR, 2025 WL 1240160, at *7 (Tex. App.—Eastland Apr. 30, 2025, pet. ref'd) (mem. op., not designated for publication) (same).

of an inaccuracy in the judgment, "[w]e have the authority to modify a judgment [sua sponte] 'to make the record speak the truth.'" *Munoz*, 2026 WL 71063, at *9. We thus hold, on our own motion, that the trial court erred by including the unpronounced $100 statutory fine in the written judgment. *Id.* (modifying judgment sua sponte to delete unpronounced $100 fine); *Baker*, 2025 WL 1240160, at *7 (similar, modifying judgments sua sponte to delete unpronounced $100 fines). Accordingly, we modify Rodriguez's judgment of conviction to delete the $100 fine.

## III.  Conclusion

Having overruled both of Rodriguez's appellate issues and modified his judgment of conviction to reflect the sentence orally pronounced, we affirm the judgment as modified. *See* Tex. R. App. P. 43.2(b).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  May 14, 2026